FIRST NATIONAL BANK OF ELKHART COUNTY V. DWIGHT SMOKER D/B/A SMOKER FARMS.

[No. 372A130. Filed August 15, 1972. Rehearing denied with opinion October 5, 1972. Transfer denied April 9, 1973.]

*William J. Reinke, Bruce R. Bancroft, Gordon S. Eslick, Thornburg, McGill, Deahl, Harman, Carey & Murray,* of Elkhart, for appellant.

*Benton E. Gates, Benton E. Gates, Jr., Gates, Gates & McNagny,* of Columbia City, *Robert J. Hepler, Hartzog, Barker & Hepler,* of Goshen, for appellee.

SHARP, J.—This action, initiated by Dwight Smoker (Smoker), plaintiff-appellee, against the First National Bank of Elkhart County (Bank), defendant-appellant, is for an alleged conversion by the Bank of sides of beef and hides from 85 head of cattle and for misappropriation of the proceeds from the sale of said cattle. The conversion allegedly occurred when the Bank exerted dominion and control over the cattle when they were in the hands of its debtor, J. L. Whisler and Sons, Inc. (Whisler) but when title to said cattle remained with Smoker. Trial was had before the court without the intervention of a jury and resulted in a judgment for Smoker in the sum of $17,576.40. The Bank duly filed its motion to correct errors, which was overruled, and this appeal was then taken.

In this case counsel for both parties have filed excellant briefs and have made helpful oral arguments.

The specifications of error, as presented by the Bank's motion to correct errors, are:

(1) The judgment is contrary to law.
(2) Certain conclusions of the trial court are legally erroneous.
(3) Certain Findings of Fact are not supported by sufficient evidence.
(4) The trial court erroneously allowed certain witnesses to testify when the names of said witnesses had not been disclosed to the Bank, contrary to IC 1971, 26-1-1-205; Ind. Ann. Stat. § 19-1-205(6) (Burns 1964).

The trial court, upon request, made special Findings of Fact and Conclusions of Law, which read as follows:

### "FINDINGS OF FACT

#### I

The Plaintiff, Dwight Smoker, is now and was prior to April 19, 1967, a producer of fat cattle, who, beginning in September 1966 and continuing until April 19, 1967, sold to J. L. Whisler and Sons, Inc., over fifteen hundred (1500) head of said cattle on a grade-and-weight basis.

#### II

Throughout the course of dealing between the Plaintiff and the said J. L. Whisler and Sons, Inc., the transactions between the parties had been in accordance with the recognized custom and usage in the trade, to-wit: cattle were delivered live by the Plaintiff, slaughtered by the packer; shrouded and hung to chill and then approximately twenty-four (24) hours later were graded by the Government grader and, at that time, the United States Department of Agriculture price list for the day of delivery, which was published the day after delivery, was applied to the grade and weight of Plaintiff's cattle in order to determine the price to be paid Plaintiff and then a check was issued in payment thereof.

## III

On April 19, 1967, pursuant to a telephone request of the previous day, the Plaintiff delivered to J. L. Whisler and Sons, Inc., eight-five (85) head of cattle to be sold on a grade-and-weight basis in keeping with the course of dealing between the parties and the custom and usage of the trade.

## IV

It was the intention of the Plaintiff and J. L. Whisler and Sons, Inc., to be bound by their course of dealing and the custom and usage in the trade as to the shipment delivered April 19, 1967.

## V

After delivery on the morning of April 19, 1967, the cattle were slaughtered, shrouded and placed in the cooler at J. L. Whisler and Sons, Inc., but were not graded or priced.

## VI

On the 19th of April 1967, the Defendant, First National Bank of Elkhart County, who had in full force and effect, security agreements and financing statements on the inventory of J. L. Whisler and Sons, Inc., which was, according to the terms of said instruments, owned by J. L. Whisler and Sons, Inc., made a demand for the payment of all sums due it from J. L. Whisler and Sons, Inc. Upon failure of the said J. L. Whisler and Sons, Inc., to meet the demand, the First National Bank of Elkhart County, by and through its agent, Clayton Emmert, offset all corporate bank accounts of J. L. Whisler and Sons, Inc., against said indebtedness and instructed J. L. Whisler and Sons, Inc., to proceed to liquidate all meat held by said packer on said date in the normal course of business, but to surrender all sums received to the Defendant.

## VII

Thereafter, pursuant to the direction and orders of the Defendant, the carcasses of the eighty-five (85) head of cattle delivered by the Plaintiff on April 19th were sold and the proceeds therefrom placed under the control of the Defendant who applied these sums and all others received to the payment of certain administrative expenses; payment for certain other cattle received the 19th day of April, after the shipment delivered by the Plaintiff; and, to the liquidation of the debt of J. L. Whisler and Sons, Inc., to the Defendant.

## VIII

The Plaintiff never received any payment for the eighty-five (85) head of cattle delivered April 19, 1967.

## IX

At the time the Defendant made its demand of J. L. Whisler and Sons, Inc., the eighty-five (85) carcasses, representing the cattle delivered by the Plaintiff, had neither been graded nor priced.

## X

The title to and ownership of the eighty-five (85) carcasses delivered by the Plaintiff on April 19, 1967 to J. L. Whisler and Sons, Inc., remained at all times in the Plaintiff.

## XI

The Defendant converted the property of the Plaintiff to its own use and benefit.

## XII

At the time of said conversion by Defendant the value of said cattle was $20,679.80.

## XIII

Plaintiff recovered from a bond of J. R. Whisler and Sons, Inc., because of their failure to pay for said cattle, $3,103.40 and the damage to Plaintiff is thus mitigated by that amount. Upon the foregoing findings of fact, the Court states the following:

## CONCLUSIONS OF LAW

### I

The law is with the Plaintiff, Dwight Smoker, and against the Defendant, First National Bank (formerly known as First National Bank of Elkhart County).

### II

Ownership of and title to the eighty-five (85) head of cattle delivered April 19, 1967 by the Plaintiff to J. L. Whisler and Sons, Inc., remained at all times in the Plaintiff.

### III

The Defendant, First National Bank of Elkhart County, converted to its own use and benefit the proceeds from the sale of Plaintiff's cattle.

IT IS THEREFORE ORDERED, ADJUDGED AND DE-CREED, That the Defendant is indebted to the Plaintiff in the sum of Seventeen Thousand Five Hundred Seventy-six Dollars and Forty cents ($17,576.40), and that judgment is hereby entered against the defendant First National Bank (formerly known as First National Bank of Elkhart County) for said amount.

Costs of this action are charged to the Defendant."

In determining whether a decision is contrary to law, this court may only consider the evidence most favorable to the Appellee together with all reasonable inferences which may be drawn therefrom

"It is only where the evidence is without conflict and can lead to but one conclusion, and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the ground that it is contrary to law." *Pokraka, et al.* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N. E. 2d 669; Menze v. Clark (1968), 142 Ind. App. 385, 387, 235 N. E. 2d 69.

There are two separate and distinct transactions which precipitated this action. The first involves the perfected security agreement between the bank and Whisler creating a security interest in all the invnetory, accounts receivable, after acquired property and proceeds of Whisler. The second transaction is the oral contract for sale of eighty-five head of cattle to Whisler by Smoker, said oral contract being based upon custom and usage in the trade and the course of dealing between the immediate parties. We are concerned with the interrelation of these two separate transactions and the legal efficacy of each vis-a-vis the interests of third parties. The issue is one of priority of interests between a secured party with a "floating lien" and a supplier of raw materials to the debtor. The fundamental issue is whether an oral agreement between a buyer and seller, relying heavily on custom and usage in the trade, can delay the passage of title to goods already delivered to the buyer so as to defeat the rights of third party secured creditors of the buyer and

transform such a creditor into a convertor of goods in the possession of the buyer. To put it another way, will a secured party holding a perfected security interest in a buyer's inventory, accounts receivable, after-acquired property and proceeds, when liquidating the buyer's inventory upon default, be deemed to have converted the property of a subsequent unperfected seller who delivers goods to the buyer before default but who reserved title until a specified time after delivery? Although we are concerned with the common law action of conversion, we must look to the Uniform Commercial Code, IC 1971, 26-1-101, *et seq.;* Ind. Ann. Stat. § 19-1-101, *et seq.* (Burns 1964), to determine the legal effect of the transactions and to ascertain the respective rights and interests of the parties involved. Once the respective rights of the parties have been established, we must then apply the applicable principles embodied in the action for tortious conversion.

The argument advanced by Smoker in favor of the judgment below is essentially that the parties to the contract for the sale of the cattle intended title to pass only after the cattle had been graded on the day following delivery. Smoker contends that the law prior to the passage of the Uniform Commercial Code was that passage of title depended upon the intentions of the parties to the contract, and that custom and usage in the trade and course of dealing, when applicable, were to be given effect in determining the intentions of the parties. Allegedly, the Code left this prior law unchanged and thus title remained in Smoker at the time the Bank made demand for payment of its note. The subsequent exercise of dominion or control by the Bank over the cattle was a conversion by the Bank.

Smoker's argument, bereft of glossing and reduced to essentials, is that custom and usage in the trade plus the course of dealing between Smoker and Whisler amounted to an express agreement as to when title to the goods was to pass. This explicit agreement, because it is based on the above in-

gredients, negates and prevents the application of IC 1971, 26-1-2-401; Ind. Ann. Stat. § 19-2-401 (Burns 1964), and the applicable sections of the Article on Secured Transactions (Article 9). An ancillary argument is that the cattle, although in the possession of Whisler, were not identified to the contract prior to grading. Since goods must be identified to the contract before the buyer can obtain a special property in the goods and before title passes, Whisler did not have an interest in the cattle at the time of demand so as to allow the security interest to attach under IC 1971, 26-1-9-204; Ind. Ann. Stat. § 19-9-204 (Burns 1964).

On February 16, 1966, Whisler executed a Security Agreement in favor of the Bank whereby Whisler granted to the Bank a security interest in all inventory then owned and thereafter acquired and all accounts receivable, then existing and thereafter arising, other collateral and proceeds and products of the foregoing categories of collateral. The Bank duly perfected its security interests by filing a Financing Statement with the Secretary of State of Indiana on February 18, 1966, in accordance with IC 1971, 26-1-9-401; Ind. Ann. Stat. § 19-9-401 (Burns 1965). The Bank, thereafter made a series of working capital loans to Whisler based on its secured position as evidenced by a promissory note dated March 31, 1966 which was secured by the above-mentioned security agreement.

Under IC 1971, 26-1-9-204; Ind. Ann. Stat. § 19-9-204 (Burns 1964), a security interest cannot attach to specific goods or collateral until there is an agreement that it attach and value is given and the debtor acquires rights in the collateral. It is uncontroverted that the first two requiremnets were met by the bank in this case. Nor does Smoker specifically and directly argue that Whisler did not have such rights in the cattle as to allow the Bank's security interest to attach thereto. Thus, although not specifically mentioned by either party, we deem it necessary to determine what rights Whisler had in the cattle and whether the rights

were sufficient to allow the Bank's security interest to attach to the same.

Several courts have considered the question in the context of whether absolute ownership in and title to collateral was the requisite right necessary to permit the attachment of the secured creditor's interest. They uniformly have held that the location of the nebulous concept "title" was immateral in ascertaining whether a debtor had sufficient rights in specific collateral. In *James Talcott, Inc.* v. *Franklin Nat. Bank* (1972), Minn., 194 N. W. 2d 775, the court stated:

> "Thus the draftsmen of the code intended that its provisions should not be circumvented by manipulation of the locus of title. For this reason, consignment sales, conditional sales, and other arrangements or devices whereby title is retained in the seller for a period following possession by the debtor are all treated under Art. 9 as though title had been transferred to the debtor and the creditor-seller had retained only a security interest in the goods. See Sussen Rubber. Co. v. Hertz (1969), 19 Ohio App. 1, 249 N. E. 2d 65, involving a consignment sale. For the purposes of answering rights of ownership under Art. 9, we hold, based upon the stipulated facts of this case, that defendant had only a security interest in the equipment despite a purported reservation of title and that debtor 'owned' the equipment at the time that the extension agreement was executed."

Also, in *Cain* v. *Country Club Delicatessen of Saybrook, Inc.* (1964), Conn., 203 A. 2d 441, the court, in attempting to ascertain when a buyer obtained rights in the collateral, observed that mere possession was insufficient to constitute such rights in the collateral. The court held that it was only when the conditional sales contract was executed some time after possession that the debtor acquired rights in the collateral so as to allow the security interest to attach. See *Herington Livestock Auction Company* v. *Verschoor* (1970), Iowa, 179 N. W. 2d 491; *Evans Products Company* v. *Jorgensen* (1966), 245 Ore. 362, 421 P. 2d 978; 30 ALR 3d 9, § 13 and § 33.

Thus, it would follow that when a debtor acquires possession of collateral under a contract, he has acquired such rights in the collateral as to allow the security interest of his creditor to attach to the collateral, and this is true regardless of who may be deemed to have title to and ownership of such collateral.

This line of reasoning is further supported by the fact that once the cattle come into the possession of Whisler, they cease to be classified as "farm products" and become "inventory." The official comments to IC 1971, 26-1-9-109; Ind. Ann. Stat. § 19-9-109, while not binding, are persuasive and read in pertinent part as follows:

> "Goods are 'farm products' only if they are in the possession of a debtor engaged in farming operations.
>
> *   *   *
>
> "When crops or livestock or their products come into the possession of a person not engaged in farming operations they cease to be 'farm products.' If they come into possession of a marketing agency for sale or distribution or a manufacturer or processor as raw materials, they become 'inventory.' "

Thus, regardless of whether Whisler had obtained title to the cattle, they became part of his inventory upon their coming into his possession pursuant to a contract for sale. As inventory, Whisler acquired such rights in and to the cattle so that the security interest of the Bank attached.

Having determined that the Bank had a perfected security interest in the eighty-five head of cattle as part of the inventory of Whisler, it remains to be determined if the oral agreement between Smoker and Whisler, in conjunction with the provisions of Article 2, in any way negate or vitiate the security interest of the bank. We must determine the legal efficacy of the retention of title by a seller after delivery of goods upon a prior perfected security interest.

In this regard, we must look to IC 1971, 26-1-2-401, Ind. Ann. Stat. § 19-2-401 (Burns 1964), which reads as follows:

"Each provision of this Article [Chapter] with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article [Chapter] and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section [19-]2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act [Chapters 1 to 9 of this title]. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of Article [Chapter] on Secured Transactions (Article 9 [§§ 19-9-101—19-9-507]), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods

(a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

(b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

(4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.' "

Also relevant are IC 1971, 26-1-1-201; Ind. Ann. Stat. § 19-1-201(3) and (37) (Burns 1964) which read as follows:

"(3) 'Agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (sections [19-]1-205 and [19-]2-208). *Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts* (section [19-]1-103)." (our emphasis)

"(37) 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. *The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer* (section [19-]2-401) *is limited in effect to a reservation of a 'security interest'."* (our emphasis)

The above provisions are supported and reaffirmed by IC 1971, 26-1-9-113; Ind. Ann. Stat. § 19-9-113 (Burns 1964) and IC 1971, 26-1-9-202; Ind. Ann. Stat. § 19-9-202 (Burns 1964), which read as follows:

"Section 19-9-113. A security interest arising solely under the Article on Sales (Article 2 [§§ 19-2-101—19-2-725] is subject to the provisions of this Article [Chapter] except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the Article on Sales (Article 2 [§§ 19-2-101—19-2-725]). [Acts 1963, ch. 317, § 9-113, p. 539.]"

"Section 19-9-202. Each provision of this Article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor."

Absent an explicit agreement, title to goods under § 19-2-401(2), *supra*, passes to the buyer at the time and place at which the seller completes his performance with reference to physical delivery of the goods. Thus, if Smoker and Whisler had not entered into an explicit agreement concerning when title was to pass, said title would have passed upon the physical delivery of the goods and Smoker would have had, at most, a purchase money security interest, IC 1971, 26-1-9-107; Ind. Ann. Stat. § 19-9-107 (Burns 1964). But, as was pointed our earlier, Smoker argues that there was an explicit agreement based on custom and usage in the trade and the course of dealing between the parties, and that this explicit agreement prevents the application of § 19-2-401(2) *supra*, and allows title to remain in Smoker after delivery.

The evidence introduced at trial showed an oral agreement by telephone between Whisler and Smoker with respect to sale of the cattle in controversy. The record is devoid of any evidence indicating an explicit oral or written agreement between Whisler and Smoker concerning the retention of title in the cattle after they were delivered to Whisler, except as reference may be made to custom and usage of the trade. However, the drafters of the Uniform Commercial Code recognized that when dealing with a usage of the trade, it should be incorporated into a contract, whether oral or written, as an explicit agreement only:

"where a usage of the trade has been previously made explicit by reduction to a standard set of 'rules and regulations' currently incorporated by reference into the contract for the parties, a relevant provision of those 'rules and regulations' is 'explicit' within the meaning of the second." (Comment 3 to the official text of the Uniform Commercial Code following Burns Ind. Stat. Annot. § 19-2-501, 1964 Repl.)

Nowhere in the record of this case is there found any evidence relating to a standard set of "rules and regulations" in the packing industry with respect to the retention of title in a farmer after the cattle have been delivered to a packer. The most we have in this case is an implicit understanding between the parties, as well as within the industry as a whole, as to when title is to pass. The implicit understanding is insufficient to meet the demands of the provisions of the Code and we, therefore, hold that there was not an explicit agreement between the parties as to when title would pass so as to remove the oral contract from the provisions of § 19-9-401 (2).

But even assuming that the evidence of custom and usage and the course of dealing between the parties was sufficient to establish an explicit agreement, it is of no avail to Smoker. The argument of Smoker ignores the sentences in § 19-2-401 (1), *supra,* regarding explicit agreements concerning retention of title to the effect that "any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." The definition of "agreement" as found in § 19-1-201 (3), *supra,* now becomes important since it specifically states that whether any agreement, even those based upon course of dealing or usage of trade, has legal consequences is determined by the provisions of the Act. Thus, the legal effect of retention of title by a seller is only the reservation of a security interest and therefore, the seller must comply with the provisions of Article 9, wherein § 19-9-202 specifically states that each provision of the article apply whether title to the collateral is in the secured party or the debtor. *James Talcott, Inc.* v. *Franklin Nat. Bank, supra, Cain* v. *Country Club Delicatessen of Saybrook, Inc., supra, Herington Livestock Auction Company* v. *Verschoor, supra;* 17 ALR 1018, 1081, § 29.

The final question to be answered concerns the definition and scope of the term "identification," and whether the cattle

in question were identified to the contract prior to grading. IC 1971, 26-1-2-501, Ind. Ann. Stat. § 19-2-501 (Burns 1964), reading as follows:

"(1)    The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them.  Such identification can be made at any time and in any manner explicitly agreed to by the parties.  In the absence of explicit agreement identification occurs

(a)    when the contract is made if it is for the sale of goods already existing and identified;

(b)    if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers;

(c)    when the crops are planted or otherwise become growing crops or the young are conceived if the contract is for the sale of unborn young to be born within twelve [12] months after contracting or for the sale of crops to be harvested within twelve [12] months or the next normal harvest season after contracting whichever is longer.

(2)    The seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him and where the identification is by the seller alone he may until default or insolvency or notification to the buyer that the identification is final substitute other goods for those identified.

(3)    Nothing in this section impairs any insurable interest recognized under any other statute or rule of law."

Title cannot pass before identification but the two are not synonymous.  Identification is of limited importance under the Code although it does determine the earliest point at which title may pass.  While § 19-2-501 does provide that identification may be made at any time and in any manner explicitly agreed to by the parties; this does not mean that the parties may delay the passage of title by the simple expedient of agreeing that the goods are not yet identified to the contract when, in fact, they have already been

delivered to the buyer. Identification refers to when the goods are still in the possession of the seller. Thus, by explicit agreement, the parties may decide that the goods are identified at a point in time earlier than those enunciated in § 19-2-501, but in no event can they delay such identification after the goods are in the possession of the buyer. This case does not deal with identification but rather with IC 1971, 26-1-2-305; Ind. Ann. Stat. 19-2-305 (Burns 1964) concerning open price terms. Our view is supported by other sections of the Code dealing with the remedies of the seller upon default by the buyer.

Pursuant to the above cited provisions, we hold, as a matter of law, that Smoker retained only a purchase money security interest in the eighty-five head of cattle upon the delivery of such cattle to Whisler under an oral contract for sale. To have effectively reserved his rights, Smoker would have had to proceed under Article 9, § 19-9-101 *et seq.*, concerning secured transactions, specifically IC 1971, 26-1-9-312(3) ; Ind. Ann. Stat. § 19-9-312(3). Since Smoker failed to perfect his security interest in the inventory of Whisler, his rights in the eighty-five head of cattle or the proceeds thereof are subordinated to the rights of the Bank, which had a prior perfected security interest, § 19-9-312(5), and this is true regardless of whether Smoker, by explicit agreement, retained title to the goods. In *Herington Livestock Auction Company* v. *Verschoor* (1970), Iowa, 179 N. W. 2d 491, 495, it was stated :

> "Thus for any purposes controlled by explicit agreement between the parties or by provisions of the Act which make passage of title a material factor, intent of the parties is relevant. But for purposes of determination of when an interest becomes a security interest, the prior metaphysical concept of title has been abandoned and analysis of the steps taken by the parties is substituted."

In *Herington* the seller was asserting an explicit agreement which wasn't based on custom and usage. There the position

of the seller was factually stronger than here and there the position of the seller was held legally untenable under the Uniform Commercial Code. *Herington* thus represents a strong and persuasive precedent for reversal here.

We must now apply the definition of tortious conversion to the rights heretofore enunciated. In *Monarch Buick Co., Inc.* v. *Kennedy* (1965), 138 Ind. App. 1, 209 N. E. 2d 922, this court reaffirmed the rule that a:

> "Tortious conversion is:
>
> 'The exercise of dominion over personal property to the exclusion and in defiance of the rights of the owner or withholding it from his lawful possession under a claim of title inconsistent with the owner's (title) . . .' Hardy v. Heeter (1950), 120 Ind. App. 711, 717, 96 N. E. 2d 682, citing Prudential Ins. Co. v. Thatcher (1937), 104 Ind. App. 14, 20, 4 N. E. 2d 574."

Prior to the adoption of the Uniform Commercial Code, ownership of goods and the rights incident thereto were defined by the location of title and the intentions of the parties was the primary test as to who had title. *Jones et al.* v. *Kilborn et al.* (1954), 125 Ind. App. 88, 122 N. E. 2d 739. The parties to a contract could delay the passage of title to a time subsequent to the delivery of the goods to the buyer. The Uniform Commercial Code, however, has established the rule that title to goods is no longer determinative once a seller has delivered the goods to a buyer and to the extent that situations arise in which there is a conflict between the prior holdings and the application of the Code which makes title and intent irrelevant after delivery, such prior authority must give way to the statute. This was explicitly recognized in *Evans Products Company* v. *Jorgensen, supra,* when that court, at page 981 of 421 P. 2d, stated:

> "It is defendants' theory of the case that this transaction constituted what would have been known in pre-UCC law as a cash sale. 'It is further defendants' theory that if the transaction is viewed by the court as a cash sale, then the veneer did not become a part of Coos' inventory until it was actually paid for.'

Prior to the adoption of the UCC we had held that a seller could retain title until the purchase price was paid. (citations omitted)

\* \* \*

Because of the passage of the UCC the above-cited cases are no longer applicable." (footnote omitted)

In *Evans* the Supreme Court of Oregon was compelled to reverse a trial court's decision in favor of a seller of raw materials under factual circumstances similar to the ones in this case because to do otherwise would violate the letter and intent of the Uniform Commercial Code. This court finds itself in the same position.

We, therefore, hold that Smoker retained only an unperfected purchase money security interest in the eighty-five head of cattle upon their delivery to Whisler and that the Bank, in ordering the liquidation of the inventory of Whisler, did not exercise dominion over the cattle in defiance of the rights of Smoker. The decision of the trial court is contrary to law under the undisputed facts of this case. The judgment of the trial court must be and hereby is reversed and remanded with instructions to enter judgment for the Defendant-Appellant.

Hoffman, C.J., not participating; Staton, J., concurs; Lybrook, J. (by designation), concurs.

NOTE.—Reported in 286 N. E. 2d 203.

## ON PETITION FOR REHEARING

SHARP, J.—We deny rehearing on the above case but deem it advisable to address ourselves to several of the arguments raised by the Petitioner-Appellee, Dwight Smoker.

Smoker strenuously advances the argument that this court has given an overly broad interpretation to IC 1971, 26-1-2-401, Ind. Ann. Stat. § 19-2-401 (Burns 1964), and thereby unduly restricted the application of other sections of the Uniform Commercial Code. The contention centers on the

proper construction to be given that portion of the introductory paragraph of § 19-2-401 which, in part, states that "insofar as situations are not governed by other provisions of this Article [Chapter]" § 19-2-401 applies. Smoker contends that since the sections on custom and usage in the trade and the course of dealings between the parties are relevant and applicable to the present situation, said sections must be considered and they prevent the application of § 19-2-401.

The fallacy in the above line of reasoning is that the above-quoted portion of a sentence from the introductory paragraph to § 19-2-401 refers to and is limited by both the preceding sentence of said paragraph and by the second portion of the same sentence. The introductory paragraph reads in its entirety as follows:

> "Each provision of this Article [Chapter] with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article [Chapter] and matters concerning title become material the following rules apply:"

The rules enumerated in the remaining provisions of § 19-2-401 are to govern all situations in which title become material and where other provisions of the chapter do not specifically cover the situation and do not refer to such title. The provisions of the chapter dealing with custom and usage in the trade and the course of dealings between the parties do not specifically refer to title and so cannot be construed as covering such situations when title becomes material. It therefore becomes necessary to examine § 19-2-401 to determine the applicable rule for the specific situation which was done in the previous opinion.

Smoker next tries to argue that IC 1971, 26-1-1-102, Ind. Ann. Stat. § 19-1-102 provides that the effect of the provisions of the Act may be varied by agreement. Once again, however,

said section contains several important qualifications, one of which is that the provisions may be varied only when it is not otherwise expressly provided in the Act. It is expressly provided in § 19-2-401 that any agreement concerning the passage of title is subject to the provisions of § 19-2-401(1) and the provisions of the Article [Chapter] on Secured Transaction. Thus any agreement concerning the passage of title, whether oral or written, is subject to the provision in § 19-2-401 limiting retention of title by the seller in goods delivered to the buyer to a reservation of a security interest.

Finally, Smoker contends that our initial decision imposes serious limitations on well-established and customary commercial transactions in this area. In his Brief in Support of Rehearing, Smoker urges that the method of financing used by cattle producers is serious endangered and states:

> "Where, as in this case the producer operates on borrowed capital secured by a lien on the cattle, which liens are paid as the cattle are sold, the ultimate result of the Court's decision is that this method of financing will no longer be available, since it would be practically impossible for the institution financing the producer to protect itself."

Smoker's argument might have some validity if it were not for IC 1971, 26-1-9-307, Ind. Ann. Stat. § 19-9-307(1) (Burns 1964), which reads as follows:

> "A buyer in ordinary course of business (subsection (9) of section [19]1-201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

For a comprehensive examination of the above section and its ramifications for secured creditors financing a farmer, see Hawland, *Financing the Farmer* (1971), 76 Com. L. J. 416. Other articles concerning this provision are *Farm Financing Under the Uniform Commercial Code* (1969), 44 N. D. Law Rev. 553; *Farm Secured Transactions Under the UCC* (1967),

23 Bus. Law J. 195; and Sorelle, *"Farm Products" Under the UCC—Is a Special Classification Desirable?* (1969), 47 Texas Law Rev. 309.

Smoker, as a seller of goods, is placed in the same position as any other seller. Chapter 2 of the Code does not make any differentiations based on the type of industry in which a seller is engaged. Chapter 9, however, does make a distinction in regard to financing farming operations by providing that a security interest in farm products created by the farmer are not destroyed when the products are purchased by a buyer. This provision, § 19-9-307, was created to help the farmer obtain the necessary financing and our opinion in no way negates the operation of said provision.

In addition to § 19-9-307, Smoker had all the protective devices afforded by Chapter 9 if he wished to avail himself of them. Furthermore, he had the remedies of a seller afforded by Chapter 2, specifically IC 1971, 26-1-2-702, Ind. Ann. Stat. § 19-2-702 (Burns 1964), which provides for reclamation of the goods upon insolvency of the buyer.

Smoker, in the instant case, did not avail himself of any of the protective devices or remedies provided by the Code, but rather relied upon the common law action of conversion, which as was pointed out in the earlier opinion, is not available under the facts of this case.

The Petition for Rehearing should be and hereby is denied.

Staton, J., concurs; Lybrook, J. (by designation), concurs.

NOTE.—Reported in 287 N. E. 2d 788.