**In re ALCOM AMERICA CORPORATION,
Debtor.**

**Bankruptcy No. 84–00138.**

United States Bankruptcy Court,
District of Columbia.

July 26, 1993.

875

Stephen B. Sale, Fehrenbacher, Sale, Quinn & Deese, P.C., Washington, DC, for debtor.

Harvey M. Katz, Leach & English, Washington, DC, for trustee.

DECISION GRANTING ARAB BANKING CORPORATION SUMMARY JUDGMENT AGAINST THE TRUSTEE AND THE DEBTOR AND PARTIALLY VACATING PROVISIONAL DECISION

S. MARTIN TEEL, Jr., Bankruptcy Judge.

This decision holds that neither the trustee, Daniel E. Leach, nor the debtor-intervenor, Alcom America Corporation, have alleged any facts which, if proven, would preclude granting summary judgment in favor of Arab Banking Corporation ("ABC" or "the bank") on the basis of the court's provisional decision entered April 16, 1993. Therefore, summary judgment will be entered in favor of the bank. However, the debtor has called into question the factual basis for one of the court's findings in the provisional decision, and accordingly, that finding will be vacated.

In the provisional decision, on the facts as alleged by the parties, the court issued a three-fold holding.

First, the court held that under the Uniform Commercial Code ("UCC") the bank had a valid security interest in the ethanol owned by the debtor.[1] The security interest was based on three different security agreements (of which the finding as to one must be amended):

Two of the agreements gave ABC a security interest in the debtor's contract rights under a contract with its ethanol supplier, the Fondo de Ordenacion y Regulacion de Producciones y Precios Agrarios ("FORPPA"), an agency of the Spanish government. The court determined that the ethanol constituted proceeds of the contract rights exercised by the debtor so that the bank's security interest continued in the proceeds.

The remaining security agreement gave the bank a security interest directly in the debtor's inventory. Because the ethanol was inventory, ABC was found to have a security interest in the ethanol. As is explained below, the court vacates its finding with respect to this security interest. However, the debtor has supplied yet another security agreement giving ABC a security interest directly in inventory. The court holds that this security agreement is valid and enforceable so that, after all, the bank did have a security interest directly in the ethanol as inventory of the debtor. This holding is also explained below.

Second, the court held that on the petition date the debtor no longer had rights in the ethanol because the ethanol at issue had been disposed of by sale before the petition was filed. Therefore, the ethanol never became property of the estate under 11 U.S.C. § 541, and there was no basis for contempt for violating the automatic stay provisions found in 11 U.S.C. §§ 362(a)(3)–(4).

Finally, the court held that in taking post-petition steps to enforce its claim against A.E. Staley Co. ("Staley"), the buyer of the ethanol, ABC did not act to collect a claim against the debtor or against property of the debtor in violation of § 362(a)(6).

For these reasons, the court was inclined to grant summary judgment in ABC's favor. However, the bank had not moved for summary judgment so the trustee and the debtor were allowed to submit evidence demonstrating the existence of a genuine issue of material fact. Both the trustee and the debtor have responded with new allegations to which the bank has replied. This decision addresses those allegations.

I

At the outset, what this case involves must be made clear. It is a motion brought by the trustee against ABC for contempt for violating the automatic stay. The motion is based on the trustee's allega-

---

**1.** The relevant sections of the UCC can be found in subtitle I of title 28 of the District of Columbia Code Annotated or in Book 62½ of McKinney's Consolidated Laws of New York Annotated as well as the most recent edition of the *Uniform Commercial Code* in the Uniform Laws Annotated series. Because the relevant provisions in both jurisdictions are identical in all material respects, the court will cite only to the "UCC."

tions that the bank sold ethanol belonging to the debtor after the petition was filed. It is not an action to avoid any of the bank's interests. After a year-long investigation and careful review of the facts discovered, the trustee elected to proceed by a motion for contempt and having made that election is bound by it.

## II

■ Because this is a contempt motion for violating the automatic stay, the trustee's appeal to equity must be rejected. At the heart of the appeal is the notion that ABC should not be allowed to keep the proceeds of the sale of the ethanol because the bank (allegedly) concealed the sale from the debtor. But this presupposes that the debtor had rights in the collateral on the petition date for only then would ABC's acts in selling the ethanol be contemptuous of the automatic stay. The conduct complained of in the trustee's appeal is more properly directed at tolling the statute of limitations for avoidance actions. It might or might not have justified such tolling but simply fails to provide any basis for a finding of contempt for violating the automatic stay. Hence, it is irrelevant here because an avoidance action must be brought as an adversary proceeding. F.R.Bankr.P. 7001.

## III

■ The debtor alleges facts designed to show that a security interest did not exist in the ethanol at issue. First, the debtor avers that the first security agreement, dated August 9, 1983, was in fact executed on December 20, 1983. According to the debtor, the second security agreement was not executed until September 28, 1983, but the ethanol at issue was derived from a shipment delivered in early September 1983. Second, the debtor alleges that the third security agreement, dated January 9, 1984, was induced by fraud. The debtor points to a fourth security agreement dated January 5, 1984, but dismisses it because it was executed without authority. Therefore, the debtor reasons, a valid security

interest never existed in the ethanol at issue.

With respect to the first set of allegations, assuming those allegations are true, the court rejects the debtor's arguments because (1) the September 28, 1983 security agreement would reach the ethanol at issue; (2) the documents executed before the ethanol was delivered in early September 1983 were sufficient to constitute a binding security agreement; and (3) once signed, the security agreement dated August 9, 1983, would relate back to that date. With respect to the second set of allegations, the court rejects those related to the authority to execute the fourth security agreement because they are conclusory, unsupported by any specific facts or explanation, and directly contradicted by the evidence in the record. The court further finds that it is of no moment whether the third security agreement was induced by fraud.

### A

The security agreement dated September 28, 1983, would reach ethanol delivered in early September. In *Maxl Sales Co. v. Critiques, Inc.*, 796 F.2d 1293 (10th Cir. 1986), the issue was whether a security agreement covering "proceeds ... arising under a certain Consignment Agreement executed by and between the parties," *id.* at 1295, reached the goods consigned, *id.* at 1297–98. The issue turned on whether the collateral was adequately described under UCC § 9–110. The court first noted that the security agreement incorporated the consignment agreement which "contained language concerning 'certain items of furniture, household goods, etc.' " to be delivered under the consignment agreement. Based on that observation, the court held that "taken as a whole" the security agreement created, "as between the parties," an enforceable security interest in the consigned goods. 796 F.2d at 1298.

In this case, the security agreement reached "all [the debtor's] right, title and interest in the following contracts (and all proceeds therof [sic])." Among the contracts listed in the security agreement was the debtor's contract with FORPPA. The

FORPPA contract described its subject matter as ethanol. This description was also contained in the security agreement. The parties' intent cannot be mistaken: the bank was to be secured by the ethanol that was the fruit of the FORPPA contract which, when the security agreement was signed, was no longer a new contract but had matured into the ethanol. In accord with *Maxl Sales Co.* the court holds that as between the parties the September 28, 1983 security agreement was sufficient to create an enforceable security interest in the ethanol previously delivered pursuant to the FORPPA contract.

In this respect, the court distinguishes those cases which state that "[u]nder the [UCC] one cannot take an interest in proceeds without also taking an interest in the underlying collateral from which such proceeds are generated." *In re Softalk Publishing Co.*, 64 B.R. 523, 526 (9th Cir. BAP 1986), *aff'd*, 856 F.2d 1328 (9th Cir.1988); *accord In re Radice Corp.*, 88 B.R. 422, 425 (Bankr.S.D.Fla.1988). These cases involved questions of perfection, and not whether a security interest existed in the first instance. Because they were made in a different context, statements to the above effect have no bearing on whether an enforceable security interest existed as between the immediate parties to a security agreement.

## B

■ Even if the September 28, 1983 documents were treated as an ineffective security agreement, the documents executed before the ethanol was delivered are sufficient to constitute a binding security agreement. These documents consist of a facility letter from ABC to the debtor and a corporate resolution by the debtor's board of directors.

The facility letter, dated August 9, 1983, sets forth the overall financing arrangement between the parties. (ABC's Mem. Supp.Opp'n Trustee's Mot.Summ.J., Ex. 3, Docket Entry ("DE") 341.) As one of the conditions to its implementation, it states "Alcom will assign all rights and benefits of the contract with Forpa to us [the bank]." It further required a resolution by the debtor authorizing the formal acceptance of the facility letter and the signing of a duplicate copy of the letter indicating acceptance. At its end, directly below the legend "Accepted:" the facility letter contains the signatures of the debtor's principals, Joseph O. Jacobson, Douglas D. Sutter, and William B. Rowles.

The corporate resolution is set forth in the minutes of an August 18, 1983 meeting of the debtor's board of directors. (Debtor's Supp'l Stmt.Facts & Evid., Ex. 1A, DE 384.) The resolution indicates that the financing facility "is accepted, approved and ratified on the terms and conditions specified in the [facility letter]."

For a non-possessory security interest to be enforceable, *inter alia*, the debtor must sign a written security agreement containing a description of the collateral. UCC § 9–203(1)(a). "Security agreement means an agreement which creates or provides for a security interest." UCC § 9–105(1)(*l*). "Agreement means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance...." UCC § 1–201(3).

■ In determining whether a binding security agreement exists, the focus is on the dual purposes underlying the requirement of a signed, written security agreement. The first purpose is evidentiary, "to prevent disputes as to precisely which items of property are covered by a secured interest." *In re Numeric Corp.*, 485 F.2d 1328, 1331 (1st Cir.1973) (citing UCC § 9–203 cmt. 3; other citation omitted). Second, the requirement serves as a statute of frauds, "preventing the enforcement of claims based on wholly oral representations." *Id.* (citing UCC § 9–203 cmt. 5). To satisfy these policies, all that is required is "[a] writing or writings, regardless of label, which adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon." *Id.* (citations omitted). ·

■ With respect to the language required by UCC 9–105(1)(*l*) to give rise to a security interest, no language of grant is required. *In re Amex–Protein Dev. Corp.*, 504 F.2d 1056, 1058 (9th Cir.1974). Focusing on the definition of "provide for," as contrasted with that of "create," the court in *Amex–Protein* held that "the requirement of [UCC 9–105(1)(*l*) ] may be satisfied not only when a security interest is caused to be or brought into existence, but also when provision or stipulation is made therefor." *Id.*

In *In re Numeric Corp.*, the court found an enforceable security agreement by reading together a directors' corporate resolution and a financing statement purporting to cover a never executed written security agreement. The court determined that the financing statement fulfilled the evidentiary function as it itemized the property covered by the security agreement, while the corporate resolution satisfied the statute of frauds as it showed that an agreement to give a security interest in fact existed. 485 F.2d at 1332. The court considered the effect of the failure of the parties to execute a formal security agreement despite their intent to do so, but concluded that "the formal document would only have memorialized an agreement which had already been made and was established by preceding writings." *Id.*

In *In re Owensboro Canning Co.*, 82 B.R. 450 (W.D.Ky.1988), the court held that a letter agreement between the parties was sufficient to amount to a written security agreement. In reaching its holding the court rejected the argument that because the letter was labeled a "letter of intent" and stated that the parties "conceptually agree" to its provisions, the debtor had no present intent to give a security interest so that the letter was only "an agreement to agree." *Id.* at 454, 455 n. 4. The court noted that once the debtor's principal signed the letter indicating the debtor's acceptance of its provisions, the security interest "became operative." *Id.* at 455 n. 4.

In accord with *Numeric Corp.* and *Owensboro Canning*, the court believes that the facility letter, which was signed by the debtor's principals, coupled with the corporate resolution provided for an enforceable security interest. Both documents indicated acceptance of the facility letter's conditions, thereby satisfying the statute of frauds, while the facility letter fulfilled the evidentiary purpose by identifying the collateral. The court's conclusion is buttressed by the fact that the parties did in fact follow through with the financing arrangement established in the facility letter. (It is further evidenced by the execution of the allegedly back-dated security agreement, which was signed by the debtor.)

### C

■ In these circumstances, where the parties clearly intended to provide for a security interest as of August 1983, the formal security agreement (allegedly) executed in December 1983 but back-dated to August 9, 1983, should relate back to August 9, 1983. The court believes this result is correct as between the parties to the security agreement because it reflects their intent, manifested in back-dating the formal security agreement, to memorialize their August 1983 agreement to provide for a security interest. *Cf. Owensboro Canning Co.*, 82 B.R. at 456.

### D

■ The debtor has supplied a copy of a security agreement dated January 5, 1984, executed by Jacobson, which gives ABC a security interest in the debtor's inventory. (Debtor's Supp'l Stmt.Facts & Evid., Ex. 1C, DE 384.) This security agreement is identical to the security agreement dated January 9, 1984, executed by Rowles. (ABC's Mem.Supp.Opp'n Trustee's Mot. Summ.J., Ex. 5, at 49, DE 341.) In the *provisional decision, the court relied on the* January 9, 1984 security agreement in finding a valid security interest in the debtor's inventory.

The court rejects the debtor's allegation, made in its pleadings, that when Jacobson signed the January 5, 1984 security agreement, he lacked authority to do so because he had been removed as an officer and

employee of the debtor. (Debtor's Supp'l Stmt.Facts & Evid., ¶ 2, DE 384.) This allegation is supported by no evidence other than Rowles's conclusory assertions and directly contradicted by the debtor's corporate minutes and previous affidavits submitted by Rowles on the debtor's behalf. No reasonable fact-finder could rely on this statement; therefore it must be rejected. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Specifically, the evidence the debtor cites is paragraph 15 of the affidavit of Rowles, the debtor's chief executive officer, in which Rowles avers that "Mr. Jacobson was not ALCOM's President, or an authorized official or employee of ALCOM, when he signed the security agreement on January 2, [sic] 1984." (Debtor's Supp'l Stmt. Facts & Evid., Ex. 1 ¶ 15, DE 384.) Rowles cites no underlying evidence to support his averment, nor does he explain the conclusion drawn. Absent any recounting of specific facts or explanation, Rowles's conclusory statement cannot stand. *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989); *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir.1985); *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221–23 (5th Cir.1985); *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Nor can it stand in the face of Rowles's own sworn statements to the contrary. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861–62 (7th Cir.1985). "The broader principle is that a party is entitled to summary judgment if his opponent cannot produce materials of evidentiary quality demonstrating the existence of a triable issue." *Lovejoy Elec., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir.1989) (citations omitted).

### 1

■ The issues here are whether Jacobson was an official or employee of the debtor and if so whether he had authority to execute the security agreement. Both issues are mixed questions of law and fact, and accordingly, Rowles's answer in the negative is an ultimate conclusion of law

and fact as to both issues. It is made baldly without indicating its basis by way of documentation or explanation. Before being properly considered for summary judgment purposes, such a statement must be supported by specific facts and explanation delineating the conclusion drawn. *Galindo*, 754 F.2d at 1221–23; *Posey*, 702 F.2d at 106. Further, the statement, without more, would be inadmissible at trial and therefore ought not be considered here. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990).

In this respect, it must be pointed out that Jacobson was previously an officer and director of the debtor who could not be eliminated unilaterally by Rowles, but only by the debtor's board of directors. There is, however, no evidence to support board action removing Jacobson as an officer and director or limiting his authority to bind the debtor. Nor is there any evidence that, before the January 9, 1984 board of directors meeting, Jacobson was no longer an officer or that he lacked authority to execute a security agreement. Accordingly, Rowles's statement is not entitled to be accorded any weight.

### 2

The court next takes pains to demonstrate that Rowles's statement is not only conclusory but also contradicted by his own or prior corporate statements. Before proceeding, it is worth noting that Rowles's statement is ambiguous. It can be interpreted to mean that Jacobson was not an official or employee of the debtor when he signed the security agreement or, alternatively, that he was an official and employee but was not authorized by the debtor to execute the agreement. (Such ambiguities can be avoided if an assertion in an affidavit is supported by specific facts and explanation.)

Either interpretation is contradicted by Rowles's prior affidavits and other evidence submitted by the debtor. In his prior affidavit in support of summary judgment, Rowles stated:

¶ 17. Arab Bank was aware that Joseph Jacobson could not authorize transfer of Alcom's alcohol and proceeds in an

amount greater than $2,000 except in conjunction with *another* ALCOM officer. This action was taken at a meeting of ALCOM's Board of Directors on January 5, [sic [2]] 1984, attended by Dwight Weatherhead, a loan officer of Arab Bank assigned to the ALCOM account. ¶ 18. Any act by Joseph Jacobson after January 5, 1984, purporting to transfer ALCOM property or funds was not authorized by ALCOM.

(Debtor's Supp'l Mem.Supp.Summ.J., Ex. A ¶¶ 17–18, DE 351 (emphasis added).) By the reference to "another ALCOM officer," Rowles indicates that Jacobson was an officer himself. Moreover, the statement that Jacobson could not authorize transfers greater than $2000 implies that he had authority to transfer less than that amount. This is inconsistent with Jacobson not being at least an employee of the debtor.

As far as the January 5, 1984 security agreement is concerned, Rowles's statement in the prior affidavit is that Jacobson's authority was limited only after January 5, 1984. Therefore, on January 5, 1984, Jacobson had the ability to execute the security agreement.[3]

In addition, Rowles has stated that "[o]n January 9, 1984, the Board of Directors of ALCOM America Corporation adopted a resolution limiting the authority of ALCOM *employee* Joseph O. Jacobson to transactions valued at $2,000 or less." (Debtor Supp'l Br. on UCC §§ 7–502 & 7–504, Ex. 1 ¶ 2, DE 359 (emphasis added).) The debtor echoed this assertion in its brief. (*Id.* at 2 ¶ 1.) Rowles's assertion indicates two things. First, it shows Jacobson was an employee during the relevant time frame. Second, Jacobson had authority to execute transactions greater than $2000 before January 9, 1984, or otherwise there would be no need to limit his authority.

Consistent with the notion that Jacobson had authority to bind the debtor in early January, the debtor asserted in support of a motion to strike, "It is undisputed that Jacobson had primary responsibility for warehouse withdrawals [of ethanol] before January 9, 1984." (Debtor Mem.Supp.Mot. Strike, at 2 ¶ 3, DE 365.) In support of this motion, the debtor includes Jacobson's affidavit in which he states that he became the debtor's president at a board meeting on December 20, 1983. (*Id.* Ex. A ¶ 2(b).) That Jacobson was the debtor's president is further supported by the debtor's petition in bankruptcy, executed by Rowles on March 16, 1984, in which the debtor lists Jacobson as its president. (Debtor's Pet., Stmt.Fin.Affairs ¶ 21 & attachment, DE 1.)

The corporate minutes dated January 9, 1984 indicate that Jacobson was a corporate official and director at that time and immediately before then:

> [Preamble] ... Attending the meeting were Directors ... Joseph O. Jacobson.... RESOLVED, THAT Mr. Joseph O. Jacobson shall be *reelected* to the Board of Directors of ALCOM....
>
> 2. ... Mr. Rowles further indicated that the scheme of individual responsibilities was formulated with an emphasis upon "checks and balances" which Mr. Kaldawy had indicated was necessary for all Officers and Directors of the Corporation. Thus, he viewed the appointment of Mr. Rozansky as Treasurer as important to separate the Office from the *Office of President which is currently held by Mr. Jacobson* as a check and balance....
>
> 4. ... RESOLVED further that Mr. Jacobson shall be replaced as Treasurer by Mr. Wilbert Rozansky.

(Debtor's Supp'l Stmt.Facts & Evid., Ex. 1B preamble, ¶¶ 2, 4, DE 384 (emphasis added).) These excerpts indicate that Jacobson was a director and also that as of the January 9, 1984 meeting, he held the president and treasurer positions.

---

**2.** The January 5, 1984 date for the meeting of the debtor's board appears to be in error. The minutes of the meeting where the board took the action described by Rowles are dated January 9, 1984. (Debtor's Supp'l Stmt.Facts & Evid., Ex. 1B, DE 384.)

**3.** See footnote 2.

In his affidavit containing the statement at issue, Rowles makes no attempt to reconcile his assertion there with his earlier assertions or with the more concrete evidence already before the court. Nor does he allege any facts to support his conclusions. Accordingly, the court cannot help but conclude that Rowles's statement "is 'little more than [a] bald assertion, entirely lacking in any recounting of specific facts,' which [the court] may properly reject as creating only a 'sham' issue." *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir.1987) (quoting *Babrocky*, 773 F.2d at 861).

### 3

Because there is no reason to question Jacobson's authority to enter into the January 5, 1984 security agreement, that agreement is held enforceable for the same reasons the January 9, 1984 security agreement was held enforceable in the court's provisional decision. *See In re Alcom Am. Corp.*, 154 B.R. 97, 108 (Bankr.D.D.C.1993).

### E

■ However, the facts alleged concerning the execution of the January 9, 1984 security agreement require partial vacation of the provisional decision. That decision held that the January 9, 1984 security agreement was valid. But the security agreement may have fallen afoul of the two-signature requirement established at the January 9, 1984 board meeting. This possibility gives rise to a genuine issue of material fact as to the validity of the January 9, 1984 security agreement. Accordingly, the court vacates its earlier holding that the January 9, 1984 security agreement was valid and enforceable.[4]

The instant decision holds that the January 5, 1984 security agreement is valid and enforceable as it was executed before the two-signature requirement was established. Therefore, in January 1984 when the bank took steps to enforce its security interest in the ethanol, it had three binding security agreements in effect, respectively dated August 9, 1983, September 28, 1983, and January 5, 1984.

### F

Whether Rowles's signature on the January 9, 1984 security agreement was induced by fraud is of no moment. That security agreement is no longer the basis for finding a security interest directly in the ethanol. Now, such a security interest is based on the January 5, 1984 security agreement executed by Jacobson. (No allegations have been made that Jacobson's signature was induced by fraud.)

### IV

■ The debtor also alleges that the ethanol was not identified to the contract within the meaning of UCC § 2–501[5] until

---

**4.** A comparison of the minutes of the January 9, 1984 board meeting and the security agreement of that same date suggests that the security agreement was executed after the board meeting. Therefore, the corporate resolution adopting the two-signature requirement arguably had divested Rowles of authority to unilaterally bind the debtor. If this is the case, Rowles's act in signing the security agreement is mystifying. It could be interpreted as validating the earlier security agreement and manifesting the debtor's intent to be bound by its terms, especially since the January 9, 1984 security agreement is identical to the earlier one signed by Jacobson. Alternatively, Rowles's signature, along with Jacobson's, could be read together to satisfy the two-signature requirement established at the January 9, 1984 board meeting. Under this reading, the January 5 and January 9, 1984 security agreements together constitute a binding security agreement. Another reading is that Rowles's signature by itself was sufficient to bind the debtor. The corporate minutes indicate that the two-signature requirement could be waived with the concurrence of the debtor's president, vice-president, and treasurer. (Debtor's Supp'l Stmt. Facts & Evid., Ex. 1B ¶ 3, DE 384.) As all three of those officers were present at the board meeting, Rowles may very well have been authorized to single-handedly bind the debtor. Finally, Rowles's signature could have been of no effect at all. The court leaves the issues raised here unanswered as it finds a total of three other security agreements already valid and in effect in January 1984 when ABC exercised its rights against the ethanol under UCC § 9–504.

**5.** UCC § 2–501 provides in the relevant part concerning agreements regarding identification as follows:

(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the

the buyer Staley received documents verifying the quality of the ethanol. Because UCC § 2–401(1)[6] broadly states that title cannot pass under a contract for sale before identification of the goods to the contract, the debtor reasons, title did not pass to A.E. Staley, the buyer of the ethanol at issue here, on the ethanol's delivery to the carrier but only on Staley's receipt of the documents.

In making this argument, the debtor fails to appreciate the proper relationship between the UCC identification and title provisions. Identification of goods to the contract establishes when the buyer obtains a special property and an insurable interest in the goods. UCC § 2–501(1). This is important for the buyer's protection when the goods have yet to be delivered for it allows the buyer to obtain insurance, *see* UCC § 2–501, and, in some circumstances, to recover the identified goods, *see* UCC § 2–502 (recovery from insolvent seller); UCC § 2–711(2)(a) (recovery from defaulting or repudiating seller); UCC § 2–716(3) (replevin of goods if cannot cover); *see also* UCC § 2–402 (buyer's rights to recover identified goods trump those of seller's general unsecured creditors). Identification also establishes the earliest point at which title to the goods can pass to the buyer. *First Nat'l Bank of Elkhart County v. Smoker*, 153 Ind. App. 71, 286 N.E.2d 203, 212 (1972), *reh'g denied*, 153 Ind.App. 71, 287 N.E.2d 788; *see* UCC § 2–401(1). However, on delivery of the goods, identification ceases to have significance as a concept (except in the case of a sale on approval, *see* UCC § 2–327(1)(a)). At this time the buyer does not have just a "special property" and "an insurable interest" in the goods but actual title to the goods themselves. "Identification refers to when the goods are still in the possession of the seller." *Smoker*, 286 N.E.2d at 212. After the seller completes its performance with respect to delivery, thereby relinquishing possession of the goods, the goods must necessarily be identified to the contract (unless the contract calls for a sale on approval). *Id.; cf. Young v. Golden State Bank*, 560 P.2d 855, 858 (Colo.Ct.App.1977).

The debtor misconstrues the language in UCC § 2–401(1) as prohibiting the passage of title in any event before identification. The relevant language states that "[t]itle to goods cannot pass *under a contract for sale* prior to their identification to the contract." UCC § 2–401(1) (emphasis added). This language limits the ability of the parties to pass title "under a contract for sale" or, in other words, to pass title by agreement in the contract itself. Its intended focus is on the

contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. . . .

6. UCC § 2–401, as set forth in the D.C.Code Ann., provides in relevant part:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 28:2–501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this subtitle. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

(b) if the contract requires delivery at destination, title passes on tender there.

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods,

(a) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

(b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

passage of title to future goods. *See* UCC § 2–401 cmt. 2. The language, however, does not purport to limit the passage of title through physical delivery of the goods under § 2–401(2) or through their constructive delivery under § 2–401(3).[7] Read in this manner, § 2–401 does not contradict itself. Identification is the earliest that title can pass, and shipment or delivery is the latest. Such an uncontradictory reading should control. *E.g., United States v. Gordon*, 961 F.2d 426, 431 (3d Cir.1992); *Love v. Thomas*, 858 F.2d 1347, 1354 (9th Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989). Thus, while the language at issue limits the parties' ability to agree to the passage of title under a contract for sale, it has no effect on the passage of title in accordance with the rules laid out in subsections (2) and (3) of § 2–401.

 Any attempt to delay identification until after title passes under UCC § 2–401 is of no effect. *Smoker*, 286 N.E.2d at 212. Title passes on delivery regardless of when identification is to occur: "Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." UCC § 2–401(1). This provision cannot be altered by agreement of the parties, custom and usage, or course of dealing. *Smoker*, 287 N.E.2d at 789–90. In short, the parties cannot "delay the passage of title by the simple expedient of agreeing that the goods are not yet identified to the contract when, in fact, they have already been delivered to the buyer." *Smoker*, 286 N.E.2d at 212.

## V

 The court has considered the other points raised by the debtor. These points concern matters addressed in the provisional decision and are rejected for the reasons stated in that decision.

However, further explanation is necessary to clear up one point regarding the disposition of the debtor's contract rights under the FORPPA contract and the disposition of the collateral. The debtor urges that the FORPPA contract was never disposed of or foreclosed upon, but rejected by the trustee in bankruptcy. This reveals a misunderstanding of the provisional decision. Under the FORPPA contract the debtor had the rights to obtain multiple parcels of ethanol from FORPPA in multiple shipments. A disposition of contract rights occurred each time the debtor exercised its rights and obtained a parcel. It is for this reason the court held the ethanol to be proceeds of the debtor's contract rights. Because its security interest continued in the ethanol as proceeds, ABC was entitled to enforce its Article 9 remedies against the ethanol, without proceeding against the FORPPA contract rights, on default by the debtor. Nothing in Article 9 required ABC first to foreclose on the FORPPA contract before exercising its rights against the ethanol. *See* UCC § 9–504 (on default secured party may dispose of "any or all of the collateral").

## CONCLUSION

Based on the foregoing and the court's provisional decision, summary judgment will be granted in favor of ABC, and, accordingly, the trustee's motion for contempt will be denied. A separate order to that effect will be entered.

---

7. See text of § 2–401 in footnote 5.