In the Matter of C. S. MERSICK & CO., Bankrupt.

Steven M. ZELMAN, Trustee, Plaintiff,

v.

G. E. ESHER, Jr., Joseph U. Labov, Individually and as Executor under the Will of Harry W. Labov, and Allan I. Sheppard, Executor under the Will of Harry W. Labov—dba Mersick Industrial Park, Defendants.

Bankruptcy No. H–77–630.

United States Bankruptcy Court, D. Connecticut.

Dec. 10, 1979.

Hebb & Gitlin, P. C., William E. Kelly, Hartford, Conn., for plaintiff.

Pasquale Young, New Haven, Conn., for defendants.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

On June 27, 1977, an involuntary petition was filed against C. S. Mersick & Co. ("Mersick"), and it was adjudicated a bankrupt by default the following July 19th.

Prior to the adjudication, Mersick was in the possession of a building at No. 458 Sackett Point Road, North Haven, Connecticut under a 25-year lease dating from 1960. At all times, the lessors have been the same persons. During 1976 and 1977, the monthly rental provided for by said lease was $10,140.61. The lessors also held a "security deposit" of $22,500.00. The lease stated that in the event of an adjudication in bankruptcy of the tenant, the lessors had the option to terminate the lease upon six months' notice. A written modification to the lease in February, 1977 provided, *inter alia,* that if the rent was unpaid for ten days after the first of any month, the lessors had the right to notify the tenant by certified mail of the nonpayment of rent, and the tenant would have ten days thereafter to pay the same or be in default. No such notice was ever sent by the lessors under this provision of the lease.

Steven M. Zelman, as the trustee of Mersick, has filed a complaint against G. E. Esher, Jr., Joseph U. Labov, and Allan I. Sheppard ("lessors"), seeking (1) the return of rental payments in the amount of $27,-121.40 on the basis that the said payments were preferences, and (2) the return of $22,-500.00 as an amount fraudulently transferred by Mersick to the defendant-lessors.

An evidentiary hearing has been held after which the parties filed a written stipulation of additional facts with the Court.

### I.

The stipulation states that for the months of September, 1976 through February, 1977, rents were received from Mersick and deposited by the lessors in their bank on different dates during each month, varying from the 8th day of a month through the 30th day of a month. In March, 1977, the rent check was deposited by the lessors on March 14th, and again on March 21st, and each time, the check was returned by the bank for insufficient funds. A substituted check of Mersick was deposited on March 28, and was honored. In April, the rent was paid by two checks by Mersick, and when one check was dishonored, Mersick delivered another check on April 21st, which check was thereafter honored. The rent checks for the months of May and June, 1977, were duly honored. During each of the last three months, Mersick utilized a check of a sublessee to make up a portion of the rental payment.

The trustee presented two witnesses. The first was Joseph Labov, one of the lessors, who denied having any knowledge of the Mersick's insolvency at any time prior to the involuntary petition being brought. He stated that in late March, 1977, he met with the president of Mersick, Jordan Friedman, in Hartford, Connecticut. Mersick had a facility in Hartford, in addition to the one in North Haven. Friedman told Labov that Mersick needed a new plant because the Sackett Point Road location was an inefficient one for Mersick's purposes. Friedman advised Labov that he would like to get out of the lease in North Haven. At this time, Mersick occupied about 30% of the leased premises and subleased the balance. A major subtenant (50% of the entire space) was United Liquors Ltd. of Connecticut, Inc. ("United"). On June 16, 1977, a written agreement was reached whereby the lessors released Mersick from all liability under the lease, and, in return, Mersick released the lessors from any claim "it may have in its security deposit in the amount of $22,500.00". At the same time, the lessors and United entered into a lease agreement whereby United leased all the premises formerly leased by Mersick under exactly the same conditions and terms as in the original Mersick lease, except that United was relieved from the payment of the rent during the last two months of the lease term, provided that amount did not exceed $22,500.00. Labov testified that, in essence, he utilized the "security deposit" to make the deal with

United, and no further security deposit was required from United. At no time was there any discussion of any financial problems of Mersick, according to Labov, with the entire transaction being one commenced and concluded at the request of Mersick's president.

The only other witness at the hearing was William J. Shea, the treasurer and controller of Mersick. He was unable to testify as to any knowledge that the lessors might have had of Mersick's financial condition. The bankruptcy schedules which Mersick filed in this proceeding, after adjudication, had been compiled by Mr. Shea. They show that Mersick claimed assets of $1,173,-000.00, and that Mersick had been in business since 1849. It also appears that there were over 350 separate creditors of Mersick at the time of the petition, with claims in excess of $3,000,000.00. Shea also confirmed that March, 1977 was the first time a Mersick rent check ever was dishonored. It was stipulated at trial that Mersick was insolvent at all relevant times.

The trustee alleges that the rent payments received by the lessors for the four months prior to the bankruptcy petition are voidable preferences under § 60b of the Bankruptcy Act. He also maintains that the "transfer" of the "security deposit" of $22,500.00 constitutes a fraudulent conveyance within § 67(d)(2) of said Act.

## II.

The purpose behind prohibiting preferences is to prevent favoritism. Whether or not a transfer of property is to be held a preference for the purposes of bankruptcy law is determined by § 60a(1) of the Bankruptcy Act.[1] If a transfer fails to exhibit each and every element of the definition found in § 60a(1), it is not a preference. 3 *Collier on Bankruptcy* ("Collier") (14th Ed.), ¶ 60.02 at 759. The lessors deny that an essential element of § 60a(1) applies to the rent payments alleged to be preferential by the trustee. Specifically, the lessors deny that these payments were "for or on account of an antecedent debt". They claim they were for a present consideration. The issue dividing the parties is thus one of characterization. Are rent payments made as these payments were, to be characterized as for a present consideration or for an antecedent debt?

No case has been offered by either party, nor has the Court found one, which precisely addresses the issue. A limited body of case law supports 3 *Collier*, ¶ 60.19 at 853, n. 20, that "current payments of rent may be said to rest on a present consideration".[2] This proposition is entirely consistent with the general policy of § 60 that payment for current expenses incidental to the operation of a business is not a preference. 3 *Collier*, ¶ 60.23 at 873. Although the cases cited in note 2 *supra* do not treat the question of when rent payments are current, the trustee has not pointed to any authority deciding that rent payments made within the month in which they fell due may constitute voidable preferences. A tenant's failure to pay rent on the date it falls due (normally in advance of the period to which it applies) does not terminate a

---

1. § 60a(1) *Preferred Creditors*. A preference is a transfer as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

2. *Matter of Bowles,* 14 Am.B.R. (N.J.) 133 (Ref. Neb.1928); *In re William P. Barrett,* 6 Am.B.R. 199 (S.D.N.Y.1901); *In re Louis J. Bergdoll Motor Co.,* 35 Am.B.R. 32 (E.D.Pa.1915); *In re Herman Lange,* 3 Am.B.R. 231 (S.D.N.Y.1899);

It will be noted that these cases were decided very early in the life of the Bankruptcy Act of 1898. The failure of later case law to attack the basic proposition found in *Collier* suggests that the proposition was too obvious to be questionable. A case *contra* was decided in this Court, *In the Matter of Alling Sport Shop, Inc.,* H–77–79. In the *Alling* case, Judge Seidman found late rent payments preferential, not for the purposes of § 60a(1), but rather as an *act of bankruptcy* to preserve the jurisdiction of the court. In rendering its decision, the Court limited its finding to the facts of *Alling,* noting that "what might appear to be a *highly technical interpretation* of past consideration becomes the only peg upon which the creditors can fasten their inquiry into the facts". (emphasis supplied).

lease, but, rather, gives rise to a right in the landlord to terminate—a right never exercised here. *Mayron's Bake Shops v. Arrow Stores,* 149 Conn. 149, 176 A.2d 574 (1961). The Mersick lease established an annual rent to be paid in monthly installments, suggesting that the period for which each installment was to be consideration was the month in which the installment fell due. Payment during that month would be for present consideration, and the Court so holds.

■ Even if the Court were to conclude that payments made as these payments were constituted a preference under § 60a(1), a further burden rests on the trustee. For such a preference to be recoverable by the trustee, the trustee must show, under the terms of § 60b, that the lessors had "reasonable cause to believe that the debtor (was) insolvent" at the time the rent payments were made.[3] On the evidence presented in this case, the trustee has not discharged his burden of proof. Despite the somewhat checkered history of rent payment during the last months preceding bankruptcy the lessors need not have reasonably believed anything more than that Mersick had temporary cash-flow problems. Mersick was presumably a substantial business concern, established in 1849, with a 16-year track record as a responsible tenant. There were over 350 creditors at this time. "A creditor is not chargeable with knowledge of the debtor's insolvency where the same could only be disclosed by the debtor's books of account to which the creditor has no access". 3 *Collier,* ¶ 60.54 at 1079.

For the foregoing reasons, the Court concludes that the rent payments made to the lessors during the four months preceding the bankruptcy petition were not for an antecedent debt and that even if they were, the trustee, having failed to show the lessors' requisite constructive knowledge of insolvency, may not recover them.

### III.

■ Fraudulent transfers under the Bankruptcy Act are governed by the terms of § 67d of the Act.[4] For a transfer to fall within the prescription of § 67d, fair consideration must be lacking. The trustee alleges that the surrender by Mersick of a $22,500 "security deposit" to the lessors in exchange for a release from their future obligations under the lease does not constitute fair consideration, thereby enabling him to avoid the transfer.[5]

The facts of this case support the claim that the release of obligations under the lease in exchange for the security deposit was a bargained-for and reasonable exchange. There is no evidence that would justify a finding of bad faith. A lease with an unexpired rental obligation of nearly nine years bound the parties, with the tenant wishing to relocate. The petition in bankruptcy which followed the exchange of mutual releases was not voluntary. The trustee has not been able to contradict the history of the release transaction as described by the lessors (Part I *supra*).

**3.** § 60b reads in pertinent part:
Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when transfer is made, reasonable cause to believe that the debtor is insolvent.

**4.** § 67d(2) reads in pertinent part:
Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this Act by or against him is fraudulent . . . if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent without regard to his actual intent . . .
§ 67d(1)(e) defines fair consideration:
[C]onsideration given for the property or obligation of a debtor is fair (1) when, in good

faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.

**5.** For the purposes of Part III of this decision, it may be noted that the amount in contention ($22,500) has been consistently characterized by the parties as a "security deposit". Whether or not it is, by law, a security deposit will be treated in Part IV *infra.* In Part III, the Court will, *arguendo,* accept the characterization of the parties and omit quotation marks setting off the term "security deposit" hereafter.

■ The trustee claims that permitting the lessors to retain the security deposit grants them a windfall. He maintains that the lessors sustained no damages because they immediately negotiated an assumption (in effect) of the unexpired lease by United. The trustee chooses to ignore the fact that the lessors applied the security deposit against the last two months' rent of the assuming sublessee—evidence that suggests a bargained-for lease assumption as part of a package deal with no windfall to the lessors.

"Whether a fair consideration has been given for a transfer must depend on all the circumstances of the case. Thus, whether a release of rights under a contract or the surrender of a lease is made for a fair consideration must depend upon whether a good bargain is being given up or a burdensome obligation is being discharged." 4 *Collier*, ¶ 67.33 at 508–509. On the facts as herein found and recounted the Court holds that the exchange of a security. deposit for a release from future rent obligations is an exchange for fair consideration and not void as to the trustee.

### IV.

The following language of the lease entered into by Mersick and the lessors has been treated by the parties as creating a "security deposit":

. . . ., except that the net rental for the last three months of the said term, namely, seventeen thousand two hundred fifty dollars ($17,250), shall be payable in advance on the date of the execution of this indenture.[6]

Nothing in this language denominates the amount to be so paid as a security deposit, and no other language in the lease deals with this matter. The conclusion is inescapable that this amount is, in law and fact, a payment of rent in advance as distinguished from a security deposit.

■ Connecticut law makes significant distinctions between a security deposit and a payment of rent in advance. *Schoen v. New Britain Trust Company,* 111 Conn. 466, 150 A. 696 (1930). The effect of this distinction is that upon termination of the lease by default or abandonment, ownership of the advanced payment of rent automatically vests in the lessor, absent a provision in the lease to the contrary. *Id.* at 473, 150 A. 696.

A series of Federal cases have recognized the state law distinction between security deposits and payments of rent in advance[7] in a situation where a trustee in bankruptcy has attacked a lessor's retention of advance rent. The cases first apply state law to determine whether the amount in contention was an advance payment of rent or a security deposit. Where an advance payment of rent is found state law is next applied to vest ownership in the lessor, either at the time of default, abandonment, or other lease termination, or at the time payment was made by the tenant. The issue seems thus to be well settled, with three Circuit Courts of Appeal in accord.

The consequences for the case before us are apparent. If the sum paid to the lessors by Mersick in 1960 was rent in advance, under Connecticut law as recited in *Schoen, supra,* the ownership of the advanced rent would have vested in the lessors either at the commencement of the lease or at the time of the termination of the lease, and there would have been, in fact, no property of Mersick transferred on June 16, 1977. Under the theory of a security deposit or under the theory of advance rental, the defendants must prevail on this issue.

Judgment may enter for the defendants on all counts of the complaint, and it is

SO ORDERED.

---

**6.** The discrepancy between the amount specified in the lease agreement and the $22,500 in contention, named in the release executed on June 16, 1977, has been neither noted nor explained by the parties.

**7.** *Sline Properties, Inc. v. Colvin,* 190 F.2d 401 (4th Cir. 1951); *Zaconick v. McKee,* 310 F.2d 12 (5th Cir. 1962); *In the Matter of Riviera Club, Inc.,* 280 F.Supp. 741 (W.D.Mo.1967); *Aylward v. Broadway Valentine Center, Inc.,* 390 F.2d 556 (8th Cir. 1968).