Opinion for the Court filed by Circuit Judge SILBERMAN.
 

 SILBERMAN, Circuit Judge:
 

 Appellant A.I. Credit Corporation (AIC-CO) appeals the district court’s entry of summary judgment affirming the decision of the bankruptcy court. 49 B.R. 605. Ap-pellee Murray Drabkin, the trustee of the now bankrupt Auto-Train Corporation, had brought an action in the bankruptcy court to recover certain payments that Auto-Train made to AICCO in the ninety-day period before Auto-Train filed its bankruptcy petition. The district court agreed with the trustee that those disbursements were preferential payments under Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b) (1982). We affirm.
 

 I.
 

 AICCO is a premium financing company. Its business is to lend money, usually to commercial enterprises, to enable the borrower to purchase insurance. Premium financing is a common commercial arrange
 
 *1155
 
 ment.
 
 See, e.g., In re Duke Roofing,
 
 47 B.R. 990, 994 (E.D.Mich.1985). As collateral for the loan, the finance company takes a security interest in the unearned premiums. It retains the right to cancel the policy in the event of nonpayment and to claim the remaining unearned premiums under the terms of the policy. This kind of security interest is predicated on the fact that although an insurance policy covering a long period into the future may be paid for in advance, the insurer earns the premiums only as each “daily unit” of insurance is extended to the insured. Thus, on any given day during the term of an insurance policy, there is a fund of unearned premiums which must be refunded upon cancellation of the coverage. Obviously, the fund diminishes with time as the insurer earns the premiums.
 

 In this case, AICCO loaned to Auto-Train $1,357,347.99 so that Auto-Train could purchase property and casualty insurance policies. In light of the risk of nonpayment, AICCO designed a repayment schedule to ensure that the available fund of unearned premiums always exceeded the unrepaid amount of the loan; the schedule required Auto-Train to repay the loan covering a year’s premiums in nine months instead of twelve and to make a substantial downpayment. Accordingly, in June 1980 Auto-Train delivered to AICCO a check for $522,-941.12, which included a downpayment of $271,469 plus two monthly installment payments. This would ensure that AICCO was never undersecured and would be, in fact, oversecured by $338,407.16.
 
 [1]
 

 Since the fund of unearned premiums was constantly diminishing, however, AIC-CO could only be certain of full repayment if it could count on the unearned premiums it could claim if it cancelled the insurance policy
 
 plus
 
 the amount of the downpayment. AICCO’s plan, which would have provided ample security for the outstanding loan, faltered when Auto-Train’s check was dishonored. AICCO learned of the dishonoring on June 25, 1980, by which time the unearned premium fund had decreased to approximately one million dollars — substantially below the $1.36 million that AICCO had loaned. Had AICCO declared Auto-Train in default at that time, it could have taken the $1 million in unearned premiums, but that action would still have left it over $300,000 short of recouping the amount originally loaned.
 

 On July 15, 1980, Richard Keating, the president of AICCO, and Robert Keesecker, Auto-Train’s vice-president for finance, agreed that Auto-Train would make weekly payments of $25,000 to AICCO instead of the previously agreed-to monthly payments of approximately $125,000. According to their new agreement, the amount of the dishonored check would be made up when Auto-Train obtained additional outside financing. The intent of the parties in entering into this agreement, which AICCO contends is material to the outcome of this case, is controverted. AICCO maintains that the parties wanted the payments to be applied only to the secured portion of the debt, offsetting the declining security interest; the trustee, on the other hand, argues that the parties intended merely to forestall AICCO from foreclosing on the unearned premiums (which would have terminated insurance coverage necessary to Auto-Train’s business), and that they did not clearly manifest an intent to apply the rescheduled payments to the secured portion of the debt.
 

 Auto-Train did not comply with the new $25,000-per-week repayment schedule, but it did make sporadic payments totalling $155,000 during the ninety days preceding Auto-Train’s petition for bankruptcy, filed on September 8, 1980. Drabkin, as trustee for Auto-Train, sued to recover that amount plus interest for the benefit of Auto-Train’s other creditors. The bankruptcy court agreed that the payments constituted preferences voidable by the trust
 
 *1156
 
 ee. The district court affirmed the bankruptcy court's decision.
 
 In re Auto-Train,
 
 49 B.R. 605 (D.D.C.1985).
 

 II.
 

 Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b) (1982), authorizes a bankruptcy trustee to avoid certain transfers of the debtor’s property to creditors if those transfers meet each of that section’s five conditions.
 
 [2]
 
 AICCO disputes only the applicability of the fifth condition. AICCO contends that because the $155,000 it received in the ninety days prior to bankruptcy were payments applied to the secured portion of the debt, it received no more than it would have been entitled to in a Chapter 7 liquidation proceeding.
 

 Even if the bankruptcy trustee satisfies the conditions of Section 547(b), a payment will not be treated as a preference if it falls within any of the exceptions set forth in Section 547(c). AICCO relies upon two of these, Sections 547(c)(1) and (4), which deal with the concept of “new value.”
 
 [3]
 
 Put simply, if a creditor contributes new value in return for payments from the incipient bankrupt, those payments will not later be deemed to have depleted the bankruptcy estate to the disadvantage of other creditors. “New value” as used in Section 547(c) is defined as:
 

 money or money’s worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, but does not include an obligation substituted for an existing obligation.
 

 11 U.S.C. § 547(a)(2) (1982).
 

 AICCO argues that in return for the $155,-Ó00 payments, it contributed new value in the form of periodic releases of its security interest in the premiums.
 

 The courts below rejected AICCO’s arguments. They found that AICCO’s claim was secured only to the extent of approximately $762,000 and unsecured to the extent of approximately $486,000. The courts concluded that the $155,000 payments had served to reduce the
 
 unsecured
 
 portion of the debt. And since Auto-Train's estate’s limited resources prevented payments of any unsecured claims, the $155,000 payment had enabled AICCO to receive more than it would have in a Chapter 7 liquidation and therefore was a voidable preference under Section 547(b). AIC-CO’s Section 547(c) “new value” argument was also rejected on the ground that the new payments schedule was merely “an obligation substituted for an existing obli
 
 *1157
 
 gation,” which is expressly excluded from the definition of new value.
 
 See
 
 11 U.S.C. § 547(a)(2) (1982).
 

 Both of AICCO’s contentions are reiterated on appeal.
 
 [4]
 
 First, AICCO argues that the payments were not preferential because the parties intended to, and in fact did, apply the payments to the secured portion of the debt. Therefore, the payments could not have diminished the unsecured debt, and could not have put AICCO in a better position than it would have been in in a Chapter 7 liquidation proceeding. For support, AICCO relies primarily on dicta in
 
 In re McCormick,
 
 5 B.R. 726 (Bankr. N.D. Ohio 1980). In that case, the trustee filed suit to recover installment loan payments made by the debtor to an underse-cured creditor during the ninety-day pre-petition period. The court held that in the absence of contrary proof, it would assume that the payments were applied to the unsecured portion of the debt because lenders normally would prefer to receive payment on that portion first.
 
 Id.
 
 at 729-30. This is so because the secured portion of the debt is protected, in the event of default, by the value of the collateral to which the secured or partially secured creditor will gain access. AICCO argues that
 
 McCormick
 
 establishes that a creditor may rebut the presumption that payments to an undersecured creditor are attributable to the unsecured portion of the debt, and that it met its burden of showing that the payments at issue in this case were in fact credited to the secured portion of the debt. It follows, according to AICCO, that there has been no diminution of the value of the estate, and hence no preference.
 

 We believe that AICCO’s position is untenable. The
 
 McCormick
 
 court correctly reasoned that an undersecured creditor would
 
 normally
 
 desire payments to be applied first to the unsecured portion of the debt. Indeed, the only context in which that would not be so would be one like the present case — where the security is rapidly diminishing in value and there is an apparent threat of bankruptcy. These are exactly the circumstances in which the creditor’s and the debtor’s intentions, no matter how ably documented, could not be permitted to govern. Obviously, as apparently happened in this case, the undersecured creditor could, by implicit or explicit threats to seize collateral necessary to continued business operations, force the debtor to enter into a new arrangement which, in “intention” and effect, unfairly obtains an advantage for that creditor over others.
 
 See infra
 
 at p. 1159. We believe, therefore, that the “presumption” noted in the
 
 McCormick
 
 case is properly treated as conclusive, not subject to rebuttal based on evidence of the parties’ intent.
 

 AICCO’s second argument is that the payments qualified as exceptions to the voidable preference rule because they were made in exchange for “new value,” either contemporaneously or subsequently conveyed.
 
 [5]
 

 See
 
 11 U.S.C. §§ 547(c)(1), (4) (1982). AICCO contends that the weekly payments were in exchange for AICCO’s release of its security interest in the premiums covering the insurance on a day-to-day basis, enabling Auto-Train to continue to enjoy the benefits of insurance coverage. Auto-Train responds that AICCO in fact did no more than forbear from exercising its right to cancel the insurance contract and claim the unearned premiums, and that such forbearance is not cognizable as new value under the Code.
 

 We agree with Auto-Train that AIC-CO’s actions in this case amounted to no more than forbearance. We do not quarrel with the notion that release of an interest, such as a security interest, like the release of property of which a creditor has posses
 
 *1158
 
 sion and control, may be sufficient to satisfy the new value exception.
 
 See In re Wilco Forest Machinery, Inc.,
 
 491 F.2d 1041, 1046-47 (5th Cir.1974). Section 101 (41) of the Bankruptcy Code defines a transfer broadly to include “every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest_” 11 U.S.C. § 101(41) (1982). Nor do we take issue with the notion that such a transfer may be sufficient even if not made directly to the debt- or, but rather for his benefit to a third party.
 
 See In re Dick Henley, Inc.,
 
 38 B.R. 210, 213 (Bankr.M.D.La.1984). But even granting these points, we are still left with the question of what value AICCO transferred to the debtor.
 

 AOCCP asserts that it contributed more than mere forbearance; that in exchange for the rescheduled payments, it actually released its security interest in the unearned premiums so that Auto-Train could continue to have insurance coverage. AICCO reasons that “Auto-Train had only a contingent right to continued insurance. In return for the payments under the new arrangement, Auto-Train gained an absolute right to insurance for each current period.” Brief for Appellant at 17. We disagree with this characterization. Once the premium was paid over to the insurer and the insurance contract became effec-five for the term of one year, the only action that could defeat Auto-Train’s day-to-day coverage was AICCO’s cancellation (due to Auto-Train’s default on the loan). In other words, the only contingency that affected Auto-Train’s coverage was the possibility that AICCO might exercise its right to cancel. Absent that contingency, under the insurance arrangement Auto-Train’s coverage would continue on a day-to-day basis as a matter of course. AIC-CO’s supposed periodic release of a portion of its security interest, therefore, is a legal fiction: what was being released was the security interest in that portion of the unearned premium fund that was evaporating with the passage of time and the operation of the agreement.
 

 In truth, then, the question whether forbearance by itself can constitute new value is at the heart of this controversy. A number of courts have addressed the issue and have reached opposite results.
 
 Compare In re Quality Plastics, Inc.,
 
 41 B.R. 241 (Bankr.W.D.Mich.1984) (officer-creditor’s forbearance constituted new value);
 
 In re Rustia,
 
 20 B.R. 131, 134 (Bankr.S.D.N.Y.1982) (creditor’s restoration of available line of credit upon credit card holder’s repayment not equivalent to giving new value by actual extension of new credit);
 
 In re Duffy,
 
 3 B.R. 263 (Bankr.S.D.N.Y. 1980) (creditor’s forbearance did not constitute new value). No case that the parties have cited,
 
 [6]
 
 however, nor any that we have
 
 *1159
 
 found, adequately explores why forbearance may or may not constitute new value.
 
 [7]
 
 We have concluded that it cannot.
 

 We think it plain that a payment to an
 
 unsecured
 
 creditor in return for that creditor’s agreement not to force the debtor into bankruptcy can never be treated as new value. Otherwise the preference provisions of the bankruptcy code would be nullified, because all creditors could extract payments within the preference period under that exception. Similarly, an agreement by an
 
 undersecured
 
 creditor to forgo his right to foreclose on collateral could not be treated as new value without unfairly prejudicing general creditors.
 
 [8]
 
 It is a basic axiom of bankruptcy law that a secured creditor is protected only to the extent of his security interest. If an agreement not to foreclose — to forbear — were treated as new value, however, then a debtor’s payment of the entire debt (both secured and unsecured portions) in return for that agreement could be sheltered from the Code’s preference provisions. The un-dersecured creditor, in other words, could leverage his security to cover the unsecured portion of the debt.
 
 See supra
 
 p. 1150. We thus must disagree with
 
 Quality Plastics,
 
 41 B.R. 241 (Bankr.W.D.Mich. 1984), which holds that forbearance is to be treated as new value if the collateral that could be repossessed is used in the operation of the business. The greater the importance of the collateral constituting the security interest, the more bargaining power is available to an undersecured creditor to extend
 
 de facto
 
 his security interest to the unsecured portion of its debt. Therefore forbearance alone — at least of this kind — cannot constitute new value without undermining basic premises of the Code.
 

 In this case, AICCO surely knew that its second arrangement with Auto-Train would afford it only questionable legal protection; it gambled, in effect, that if it did not cancel the insurance policy Auto-Train would recover or at least be able to refinance. The bankruptcy laws do not provide insurance for such gambling. To be sure, we are mindful that we are recognizing a rule that may induce undersecured creditors, or at least those holding collateral rapidly diminishing in value, to foreclose early when a debtor appears to be in financial jeopardy. The alternative, however, would be to grant an undersecured creditor advantages over general creditors that Congress, by providing for avoidance of preferences, sought to preclude.
 
 [9]
 
 We therefore conclude that the payments at issue in this case constituted voidable preferences under Section 547(b). The judgment of the District Court is therefore
 

 Affirmed.
 

 [1]
 

 . This figure represents the value of three months’ premiums. By requiring Auto-Train to repay the loan in three-quarters of the time in which the premiums would be earned,
 
 i.e.,
 
 in nine months instead of twelve, AICCO allowed three months’ worth of premiums to remain available at all times.
 

 [2]
 

 . Section 547(b) provides as follows:
 

 Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
 

 (1) to or for the benefit of a creditor;
 

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 

 (3) made while the debtor was insolvent;
 

 (4) made—
 

 (A)on or within 90 days before the date of the filing of the petition; ....
 

 (5) that enables such creditor to receive more than such creditor would receive if—
 

 (A) the case were a case under chapter 7 of this title;
 

 (B) the transfer had not been made; and
 

 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 

 11 U.S.C. § 547(b) (1982).
 

 [3]
 

 . Subsection (c) provides in pertinent part as follows:
 

 The trustee may not avoid under this section a transfer—
 

 (1) to the extent that such transfer was—
 

 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 

 (B) in fact a substantially contemporaneous exchange;
 

 [[Image here]]
 

 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
 

 (A) not secured by an otherwise unavoidable security interest; and
 

 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor....
 

 11 U.S.C. § 547(c) (1982).
 

 [4]
 

 . AICCO also argued below that the payments fit exceptions described in 11 U.S.C. § 547(c)(2) and (c)(5) and that the trustee was barred by a judgment in a related case under principles of res judicata. Both the bankruptcy court and the district court rejected these arguments and AIC-CO has not pursued them in this appeal.
 

 [5]
 

 . We address contemporaneous and subsequent new value together because we regard the controlling issue in this case to be whether there was new value, not its temporal classification.
 

 [6]
 

 . AICCO also argues, in support of the proposition that forbearance can constitute new value, that the situation before us is analogous to the payment of rent:
 

 Both occupancy time and unearned insurance premiums are consumable, wasting assets. Where a lease establishes an annual rent to be paid in monthly installments, payments made prior to the filing of a bankruptcy petition are held to have been made for present consideration, not for antecedent debt. Likewise, where the restructured payment schedule required payment of weekly installments approximately equal in value to the insurance consumed during the week, there was present consideration. Just as the landlord allows a tenant to use the landlord’s property on a current basis, so AICCO allowed Auto-Train to use its property, AICCO’s security interest, on a current basis.
 

 Brief for Appellant at 18 (footnote omitted). Appellant cites two cases in support of this reasoning; neither, however, is on point. In
 
 In re Mindy's,
 
 17 B.R. 177 (Bankr.S.D.Ohio 1982), the court held that the current rent payments came within the exception of subsection (c)(2), which relates to payments made in the ordinary course of business within forty-five days of the date when the debt was incurred. The
 
 Mindy’s
 
 court did not hold that the continued occupancy of the premises constituted "new value" in exchange for the rental payments. The court in
 
 In re C.S. Mersick & Co.,
 
 1 B.R. 599 (Bankr.D.Conn. 1979) applied the pre-1978 Bankruptcy Code and did not consider the question of new value at all. But AICCO perhaps means merely to draw an analogy to the rental situation, in which payments for currently due rent are generally considered to be in exchange for the present consideration of continued occupancy.
 
 *1159
 
 See
 
 In re Mindy’s,
 
 17 B.R. at 179. The payment of current rent doubtless has an element of forbearance in it: the tenant’s payment has the effect of preventing the landlord from exercising his right to repossess the premises. Still, the cases upon which AICCO relies do not stand for the proposition that forbearance constitutes new value generally. Landlord and tenant law, in part because of its ancient origins, is best treated as
 
 sui generis.
 

 [7]
 

 .The court in
 
 In re Duffy
 
 reasoned that forbearance amounted to "an obligation substituted for an existing obligation," which is expressly excluded from the statute’s definition of new value.
 
 See
 
 11 U.S.C. § 547(a)(2) (1982); 3 B.R. at 266. The meaning of that phrase is not entirely clear, however. Legislative history casts little light on the meaning of "new value”: the terms used in Section 547(a) were intended to be "defined in their ordinary senses.’’ H.R.Rep. No. 595, 95th Cong., 1st Sess. 372 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6328. Other courts, moreover, have reached different interpretations.
 
 See, e.g., In re D.A.C. Meats,
 
 8 B.R. 230 (Bankr.S.D.N.Y.1981). We decline, therefore, to rely on the reasoning of the
 
 Duffy
 
 court, and rest instead on our own analysis of the statute, in reaching the conclusion that forbearance does not constitute new value.
 

 [8]
 

 . The question does not arise with respect to a fully secured creditor. By definition, payments made to it do not disadvantage other creditors.
 

 [9]
 

 . Parties to commercial transactions, in any event, are always better off if the law governing the transaction is clear, and a holding contrary to ours would introduce much legal uncertainty.