In re NETTEL CORPORATION, INC., et al., Debtors.

Wendell W. Webster, Trustee, Plaintiff,

v.

Harris Corporation, Defendant.

Bankruptcy No. 00–01771.
Adversary No. 02–10128.

United States Bankruptcy Court, District of Columbia.

Dec. 9, 2004.

Linda M. Correia, Jonathan C. Puth, Washington, DC, for plaintiff.

Philip T. Evans, Washington, DC, for defendant.

### SUPPLEMENTAL DECISION RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [1]

S. MARTIN TEEL, JR., Bankruptcy Judge.

The plaintiff, Wendell W. Webster,[2] seeks to avoid pursuant to 11 U.S.C.

---

1. This decision supplements, and with respect to a $3,184.58 amount as to which the court has now concluded summary judgment cannot be granted, amends the court's oral decision of November 23, 2004, regarding Web-ster's motion for summary judgment. To set the context, some parts of that oral ruling are repeated here.

2. Webster has pursued this proceeding as the trustee under chapter 7 of the Bankruptcy

§ 547(b), the payment under a contract ("Contract") of $127,400.00 on August 4, 2000, by one of the debtors, NETtel Corporation, Inc., to the defendant Harris Corporation ("Harris"), and seeks to recover a judgment under 11 U.S.C. § 550(a) for the amount of the avoided transfer. The court will grant Webster's motion for summary judgment as to all but $3,184.58 of the $127,400.00 payment for the following reasons.

The parties are in agreement that the elements of § 547(b) have been established to make the transfer an avoidable preference unless it comes within an exception under § 547(c). The only issues are:

(1) whether the payment to Harris is excepted from § 547(b) by § 547(c)(4) based on new value conferred on the estate from its continued enjoyment of its rights under the Contract in the period after the preferential transfer and prior to the filing of NETtel's petition,

(2) whether Harris has asserted a valid recoupment defense based on the value of the estate's continued enjoyment of its rights under the Contract after the commencement of the case, and

(3) whether Harris has established its entitlement to recover on a counterclaim based on Webster's alleged breach of his obligation to return or certify destruction of all Harris software on the Harris equipment NETtel had purchased.

I

The material facts necessary to largely dispose of this proceeding by way of summary judgment are not in genuine dispute. The background facts follow.

Code (11 U.S.C.) in the jointly administered cases of NETtel Corporation, Inc., and NETtel Communications, Inc.

3. The Contract was entitled Contract for a Harris Network Management System Be-

In March 1999, NETtel Communications, Inc., and Harris entered into the Contract[3] under which the parties agreed that Harris would sell NETtel Communications, Inc., certain equipment, license to it certain software, and provide it maintenance and consulting services. The schedules filed by the debtors reveal that NETtel Communications, Inc. was a holding company owning all of the shares of NETtel Corporation, Inc., and it was that latter entity that used the system in running its own telecommunications network for various customers. Webster and Harris have viewed both NETtel entities as liable for the debts arising under the Contract, and thus for ease of discussion the court will generally refer to "NETtel" without the necessity of differentiating between the two debtors.

The Contract called for installation of two separate systems—a primary system in Washington, D.C., and a back-up system in Houston, Texas—but the back-up system was never shipped to Houston. Although the parts for the back-up system were shipped to Washington, D.C., NETtel never operated the back-up system. Harris shipped and installed the primary system equipment well prior to the preferential payment.

The full Contract amount was $815,705.00, and substantial installment payments were made as various benchmarks were met. After the final benchmark had been met (via NETtel's acceptance of the system in March 2000), Harris billed the final unpaid balance of $254,800 with payment due by May 6, 2000.

tween NET-tel [sic] Communications and Harris Corporation Communications Division, and attached and incorporated a Software License Agreement and a Maintenance & Consulting Services Agreement.

On August 4, 2000, NETtel paid Harris $127,400 (the preferential transfer at issue), leaving an unpaid overdue balance in the like amount of $127,400. NETtel Corporation, Inc. and NETtel Communications, Inc., filed petitions commencing cases under chapter 11 of the Bankruptcy Code on the respective dates of September 28, 2000, and October 16, 2000, and the court subsequently ordered joint administration of the two cases. The cases were converted to chapter 7 on October 23, 2000, and Webster was appointed trustee.

Webster continued to operate the debtors' business until the end of December 2000. The court granted Webster's motion to reject the Contract with Harris by an order entered on December 26, 200, but effective as of the date of signing, December 20, 2000.

## II

Harris claims that any amount of a preference should be eliminated or reduced under 11 U.S.C. § 547(c)(4) by reason of subsequent new value provided by Harris to NETtel. Webster responds that (1) Harris failed to plead § 547(c)(4) as an affirmative defense; (2) Harris extended no new credit to NETtel *subsequent* to the preferential transfer, such that § 547(c) is inapplicable; and (3) Harris has not established the amount of any new value conferred upon the estate.

## A.

■ Although § 547(c)(4) was not specifically pled, Harris did assert setoff and recoupment as a defense, and made clear in discovery it believed it was entitled to a credit for services rendered after the preferential payment.

Accordingly, Harris would be allowed to amend its answer to plead § 547(c)(4) as an affirmative defense, and the court will address the remaining issues as though Harris had properly pled § 547(c)(4) as a defense.

## B.

■ Webster's first response regarding the merits of the § 547(c)(4) defense is that the defense is inapplicable because Harris provided no new credit to NETtel beyond that provided by the original Contract. Stated differently, he urges that there was no value "aside from that covered by NETtel's original debt on the Contract, all of which came due *prior* (and not subsequent) to the preferential transfer at issue." Harris admits that it provided nothing to NETtel beyond what had been originally contracted for between the parties. Furthermore, Harris has not cited any legal authority addressing this issue.

However, it makes no sense as a matter of bankruptcy policy that payment of a debt-come-due for future services gives rise to an avoidable preference even when the future services are performed.[4] Con-

---

4. As explained in *In re Teligent, Inc.*, 315 B.R. 308, 315 (Bankr.S.D.N.Y.2004):

> The "new value" exception encourages creditors to deal with troubled businesses, and promotes equality of treatment among creditors. It recognizes that the "new value" effectively repays the earlier preference, and offsets the harm to the debtor's other creditors. Accordingly, "the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate."

[Quoting *Kroh Bros. Dev. Co. v. Continental Construction Engineers, Inc. (In re Kroh Bros. Dev. Co.)*, 930 F.2d 648, 652 (8th Cir.1991). Other citations omitted.]
What counts in this case is the performance of services in exchange for the preferential payment (whether applied to an amount owed for past services provided or received as a down-payment for the subsequent services), as those subsequent services increase the value of the estate.

trary to Webster's implicit assumption, new value is not limited to extensions of new credit. "New value" is defined in relevant part in § 547(a)(2) as:

> money or **money's worth in** goods, ser-**vices,** or new credit, ... but does not include an obligation substituted for an existing obligation.

[Emphasis added.] As stated in Collier on Bankruptcy, ¶ 547.04[4][c] at p. 547–68.4 (15th ed. as revised March 2003):

> New value involving the provision of services is deemed given on the date the personal services are rendered. [Citing *Excel Enters., Inc. v. Sikes, Gardes & Co. (In re Excel Enters., Inc.)*, 83 B.R. 427, 431 (Bankr.W.D.La.1988).]

It follows that services provided after the preferential payment for such services (because the contract called for payment be-fore rendition of the services) constitutes new value.[5] Although the parties have cited no decisions so holding, numerous decisions hold that subsequent performance under executory contracts and leases constitutes new value,[6] and support the court's conclusion here. That the services were already contracted for prior to the preferential payment is irrelevant: what counts is whether any of the services were rendered after the preferential payment.

■ Presumptively, the increase in value to the estate arising from a subsequent performance of services will be measured by the contract price of the services. *In re Jones Truck Lines. Inc.*, 130 F.3d 323, 328 n. 4 (8th Cir.1997); *In re Molten Metal Technology, Inc.*, 262 B.R. 172, 176 (Bankr.D.Mass.2001).[7]

---

5. Not surprisingly, most § 547(c)(4) decisions, including those upon which Webster relies, involve the common fact pattern of a merchant delivering, via a new sale, goods or services after a bill for a prior sale and delivery of goods or services has been satisfied by a preferential payment. Perhaps the paucity of § 547(c)(4) decisions involving *delivery of goods or services after a preferential payment for the very same goods or services* can be explained by the absurdity of not treating as new value such subsequent delivery of goods or services in exchange for the payment.

6. Webster's reply brief itself cites *Charisma Investment Co., N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082, 1084 (11th Cir.1988), which avoids the issue but cites *In re Dick Henley, Inc.*, 45 B.R. 693, 699 (Bankr.M.D.La.1985); *In re Quality Plastics, Inc.*, 41 B.R. 241 (Bankr.W.D.Mich. 1984); and *In re Keydata Corp.*, 37 B.R. 324, 328–29 (Bankr.D.Mass.1983), as finding new value based on a creditor's having continued to provide insurance coverage, to allow use of rented equipment, or to supply electricity. *See also Southern Technical College, Inc. v. Hood*, 89 F.3d 1381, 1384–85 (8th Cir.1996) ("Each month, a lessee receives new value from its lessor when it continues to use and occupy the rented premises."); *Brown v. Morton (In re Workboats Northwest, Inc.)*, 201 B.R. 563, 567 (Bankr.W.D.Wash.1996)

(same); *Claybrook v. Pizza, Inc. (In re Discovery Zone, Inc.)*, 300 B.R. 856, 860–61 (Bankr. D.Del.2003) (use of trademark after paying licensing fees for the same constituted new value); *Peltz v. Applic'n Eng'g Group, Inc. (In re Bridge Info. Sys., Inc.)*, 287 B.R. 258 (Bankr.E.D.Mo.2002) (performance of information technology services was new value); *Holmes Envtl., Inc. v. Suntrust Banks, Inc. (In re Holmes Envtl., Inc.)*, 287 B.R. 363 (Bankr. E.D.Va.2002) (new value arose when subcontractor performed services for debtor-contractor).

7. For purposes of addressing the instant motion, the court will assume in Harris's favor that to the extent that Harris can demonstrate the contract price of the services, it measures the value. However, in some cases an issue may exist whether the contract price can be rejected under § 547(a)(2) as the "money's worth" of the services when the contract price is excessive in the market, and whether, alternatively, the excessive contract price can only be set aside under 11 U.S.C. § 544 (which addresses avoiding the incurring of an obligation via the trustee's invocation of certain actual or hypothetical creditors' rights under nonbankruptcy law) or 11 U.S.C. § 548(a)(1) (which addresses avoiding the incurring of an obligation in exchange for less than reasonably equivalent value).

Webster notes that Harris simply elected to forbear from terminating the Contract (meaning its provisions for continued maintenance services and for a continued license to use Harris's software). Webster argues that Harris is not entitled to treat forbearance as new value, citing *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153 (D.C.Cir.1986). However, *Drabkin* is distinguishable. There, a lender financed the debtor's payment of insurance premiums and took a security interest in the unearned premiums (that is, premiums not yet earned through the passage of time during which insurance coverage remained in place). When the debtor defaulted in making scheduled repayments, the lender forbore from foreclosing on the unearned premiums, and argued that its forbearance was new value to the extent that it allowed its security interest in unearned premiums to diminish by the amount of insurance earned by the insurer's having provided coverage after each payment. However, the lender was not providing any goods or services to the debtor: the insurer, who had been paid, was providing insurance coverage, not the lender. *Drabkin* does not address a case, such as NETtel's, in which the supplier of goods or services continues to provide goods or services in exchange for the preferential payment.[8]

■ Here, after the preferential payment was made on August 4, 2000, and to the extent that Harris did not terminate the contract for non-payment of the $127,400 left unpaid, Harris remained obligated to continue to provide services under the Contract and to allow NETtel to utilize the software. Harris claims that it did provide such services through the end of October 2000 and that the estate continued to utilize the software until sometime in December 2000. Harris thus claims credit for services and use of software after the preferential transfer and before the petition filing as a defense under § 547(c). To the extent that Harris can prove the value of any such services and use of software, it would establish its new value defense.[9]

### C.

■ However, Harris has largely failed to establish the value of its prepetition services and software usage for purposes of its § 547(c)(4) defense, an issue on which it bears the burden of proof under 11 U.S.C. § 547(g). Only to the extent that it fixes a dollar value of any "new value" contribution can Harris assert a § 547(c)(4) defense.[10]

The Contract consisted essentially of three components: equipment, a software license, and maintenance service. Only as to $3,184.58 of maintenance services has Harris offered sufficient evidence to show that it possibly conferred new value on the estate.

---

8. *Compare Drabkin,* 800 F.2d at 1158 (right to insurance coverage had already been paid, and thus there was no new value after payment to creditor secured by unearned premiums) *with Dick Henley, Inc.,* 45 B.R. at 699 (value of insurance coverage provided after paying delinquent premiums was new value).

9. Harris has also asserted the value of postpetition services and use of software as a recoupment defense, and that is discussed in the next part of this decision.

10. *See Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Systems, Inc.),* 861 F.2d 1555, 1559 (11th Cir.1988) ("a party seeking the shelter of section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange," especially because § 547(a)(2) contemplates "a specific dollar valuation of the 'new value'—the 'money's worth'—that the debtor received in the exchange."); *In re Spada,* 903 F.2d 971, 975–76 (3d Cir.1990) (creditor must establish the dollar value of the new value, not merely that some benefit was conferred).

Regarding equipment, the per diem formula Harris used improperly prorated the entire $815,705 contract amount over a two-year period even though NETtel had already become the owner of the equipment which had been included in that price. Title passed when the equipment was delivered to NETtel. *See In re Alcom America Corp.*, 156 B.R. 873 (Bankr. D.D.C.1993), *aff'd*, 48 F.3d 539 (D.C.Cir. 1995).[11] The portion of the contract allocable to purchase of the equipment cannot be treated as new value.[12] That leaves the software usage and maintenance services.[13]

■ Valuation of the software license usage after the preferential transfer is impossible on the evidence presented by Harris:

* The license was a perpetual license. (Although the license was subject to termination in the event of a default, that does not affect the valuation issue.) Harris has offered no evidence regarding the value of the software license. Moreover, even if that value had been established, Harris offered no evidence

regarding the useful life of the software license to enable a fact-finder to determine a period over which the value should be prorated.

* The Software License Agreement included a warranty for 90 days after delivery of the software. That warranty had expired prior to the date of the preferential transfer, so the value of the software warranty cannot be included as present value.

* The Software License Agreement also included an obligation to provide NETtel new or enhanced versions of the software which were commercially introduced by Harris during the "Software Maintenance period" provided NETtel agreed to pay an "Annual Maintenance Fee." However, Harris offered no evidence to show that it provided NETtel new or enhanced versions of its software after the preferential transfer.

Accordingly, Harris has not established the amount of any new value with respect to software usage.

---

11. In addition, prior to the preferential transfer, Harris had completed the installation of the equipment, and Harris has offered no evidence as to the value of its installation work as part of the total contract price. Moreover, the Contract included a 90–day warranty that commenced on NETtel's acceptance of the equipment and software in March 2000. That 90–day warranty expired before the preferential payment in August 2000 and Harris has offered no evidence as to the value of that warranty, again an item that must be excluded from the Contract price in computing new value arising after August 4, 2000.

12. Harris offered no evidence as to the value of the equipment. Harris acknowledges that the equipment had inherent value independent of the software. Fleeman Dep. at p. 80. Harris itself sought the return of the equipment for that reason.

However, Harris's opposition includes an affidavit of Richard Lear in which, in part, he recites that he told a purchaser of some of the

equipment of his (Lear's) "understanding that the Harris equipment would not work properly without the Harris software designed to support the Harris Network System." Nevertheless, that does not establish that only the software had value.

First, Lear's quoted statement has not been shown to have been made on personal knowledge. Second, the statement is hearsay as Lear's affidavit is reciting a statement he made in the past, rather than making a present statement of fact. Finally, even if Lear's statement were received into evidence, the purchaser and Harris would be in a classic position to negotiate a win-win outcome for themselves as two parties holding items that could confer value on both parties if they reached a consensual resolution setting forth mutually beneficial terms.

13. Under the Contract, NETtel could contract for Harris to provide consulting services on an as-needed basis, but Harris never provided such consulting services.

■ Maintenance services (part of the $815,700 purchase price) were to be provided for a period of one year after the 90–day warranty period expired. Fleeman Dep. at p. 38. The warranty period (set by Contract ¶ 11) commenced in March 2000 when NETtel accepted the system, and thus maintenance service was to run to sometime in June 2001. The maintenance services are sometimes referred to as an extended warranty coverage. Fleeman Dep. at 44 and 64. Harris cut off such extended warranty coverage on September 20, 2000. Fleeman Dep. at 44. So at most Harris has established that it can charge for 46 days of maintenance service starting on and including August 5, 2000 (because the record does not reflect the precise time on August 4, 2000, that Harris received the preferential payment) and ending on and including September 19, 2000 (because the record does not reflect the precise time on September 20, 2000, that Harris terminated the maintenance service).

The court rejects Harris's argument that it is entitled to a new value defense for services after September 20, 2000. A close reading of Charles Fleeman's deposition reveals that Harris cannot establish that it provided any meaningful services after September 20, 2000, and that it would be unable to value such services. Fleeman testified that Harris cut off extended warranty coverage to NETtel on September 20, 2000, and that after September 20, 2000, Harris "would not have taken any new requests for support of maintenance. And that is my understanding that we did not take any more new ones after September 20." Fleeman Dep. at p. 46. After September 20, 2000, Exhibit 11 to Fleeman's deposition (an exhibit not on file with the papers relating to the motion for summary judgment) apparently showed that three technical support tickets were modified on September 29, 2000, and another technical support ticket was modified on October 6, 2000, and two others were modified on October 31, 2000. Fleeman Dep. at 53–54. However, Fleeman does not know if any work was associated with the post-September 20, 2000 modification of support tickets (other than closing the tickets out), and he acknowledged that he would be unable to quantify the value of such work if it was in fact done. Fleeman Dep. at 54–55. Similarly, after September 20, 2000, Harris never updated the software it had provided to NETtel pursuant to the contract. Fleeman Dep. at 49.

Harris's accounting department elected to treat $52,650 of the contract price as attributable to the maintenance agreement (Fleeman Dep. at 43), however that alone does not suffice to establish the reasonableness of that treatment. Harris derived that $52,650 from a pricing schedule for the Harris system sold to NETtel. Fleeman Dep. at p. 49.[14] The pricing schedule is presumptive evidence of the value of maintenance services.[15] For the

14. Harris also apparently has standard charges for maintenance services, for the parties agreed that after discontinuance of maintenance services, NETtel could reinstate such maintenance "after paying in full all unpaid maintenance payments commercially charged during such discontinued period," and that any services required to reinstate the maintenance services "shall be charged at Harris' current standard hourly service rates in effect at the time of purchase of such maintenance services." See the Contract's Maintenance & Consulting Services Agreement, at § 8(c) ("Maintenance Fee[:] *Discontinuance*"). Harris offered no evidence regarding standard maintenance service charges.

15. Harris pointed to the administrative claim filed in the main case that apportioned the Contract price amongst the three components of the contract, and thus implicitly rejected Webster's contention that there was no genuine dispute for Rule 56 purposes that Harris only prorated the entire Contract amount.

D.C. system, the warranty (meaning maintenance) was priced at "$31,500 for one year extended warranty," and for the Houston backup system—which was never placed in operation—the "one year extended warranty" was priced at $21,150. Fleeman Dep. at p. 50.

■ However, the Houston system was never assembled by Harris and thus was never operated. Accordingly, Harris never provided maintenance services as to it. As observed in *Teligent, Inc.*, 315 B.R. at 317, "[a] promise to deliver services at a future date does not 'replenish' the estate; only the actual delivery of the services does." Even in the case of leased real estate or equipment, the lease does not confer new value if the debtor has abandoned use of the property as part of its business.[16] Logically, because the maintenance services were not something in NETtel's possession, this is an even stronger case for ruling that the non-utilization of the services did not confer new value. Accordingly, Harris cannot claim a new value amount attributable to its right to provide maintenance of the backup system.

Thus, at best Harris could charge for the 46–day period a prorated amount of the $31,500 price attributed to maintenance of the primary D.C. system. As already indicated, the period of maintenance service was a period ending one year after the 90–day warranty period. Accordingly, the maintenance service period was 365 days plus 90 days which equals 455 days. The record is unclear whether the $31,500 price was for the full 455 days or for the one year beyond the 90–day warranty period.[17] Because 11 U.S.C. § 547(g) assigned to Harris the burden of proof on the § 547(c)(4) defense, and it has failed to put sufficient evidence in the record to demonstrate that the price covered only one year of the maintenance service, the court will treat the $31,500 price as attributable to the entire 455–day period of maintenance service.[18] Using 455 days as the appropriate proration period results in a per diem charge of $69.23 per day. Applying that $69.23 rate to the 46–day period during which NETtel was receiving maintenance services for the primary D.C. system after the preferential period results in new value of $3,184.58.

Harris's opposition to the motion for summary judgment did not point to Fleeman's testimony regarding the pricing of the maintenance services. However, the court is not obligated to disregard that testimony once the court discovered the testimony in the deposition transcript that Webster himself put into evidence.

16. *See Charisma Investment Co., N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d at 1084 (landlord could not claim a new value contribution when the debtor did not utilize or sublease the leased real estate after the preferential payment); *Official Plan Committee v. GE Capital Corp. (In re Omniplex Communications Group, L.L.C.)*, 297 B.R. 573, 577 (Bankr.E.D.Mo. 2003) (GECC's lease to debtor of unassembled leased equipment conferred value on estate so long as debtor intended to assemble and use

the equipment later, but once the manufacturer, Lucent, announced that it would no longer support the product line for which unassembled equipment was acquired, the debtor "no longer could or intended to receive any material benefit from the use of the leased equipment").

17. The exhibits shown to Fleeman at his deposition that dealt with the pricing of the maintenance services were not filed with the copy of the deposition attached to the motion for summary judgment.

18. Harris assumed that a two-year period would be appropriate for prorating the entire contract price in computing the amount of its new value defense. The court's use of a 455–day period is more favorable to Harris than its use of a two-year period.

Webster urges that because the Houston system was never installed and was never made operational, and represented $171,405 of the contract price, which exceeded the unpaid price of $127,400, NETtel had already overpaid for the Contract. The court rejects that argument for three reasons.

First, NETtel had received and become the owner of the Houston equipment and was obligated to pay for it.[19] Accordingly, NETtel, like any purchaser of goods, was obligated to pay for the system. That the system conferred no benefit on the estate is irrelevant: title to the system passed prior to the preferential payment, and is not part of the new value Harris could claim.

Second, the estate was replenished to the tune of $3,184.58, from a preference analysis standpoint, by Harris's subsequent provision of $3,184.58 of services for the primary system, and the estate continued to contain as well whatever claim the estate also had to pursue any overpayment on the Contract based on non-use of the Houston system. Webster has not pursued such a non-bankruptcy claim against Harris.

Finally, even if the court accepted Webster's premise that the $171,405 amount allocated to the Houston system should be eliminated from the Contract, and the court started mixing a claim for recovery of an overpayment based on non-use of the Houston system with Webster's preference claim, his argument would fail. The stated

amount owed on the Contract (without eliminating any sum owed for the Houston system) prior to the making of the $127,400 preferential payment was $254,800 which exceeded by $83,495 the $171,405 amount allocated to the Houston system. The trustee is recovering $124,215.42 (all but $3,184.58 of the $127,400.00 preferential payment), and the remaining $3,184.58 part of the payment must be viewed as included in the $83,495 portion of the payment that was required to be paid under the Contract even under Webster's view.

Accordingly, Webster is not entitled to summary judgment with respect to the $3,184.58 of maintenance services provided after the making of the preferential payment, and is thus entitled to summary judgment as to only $124,215.42 of the $127,400 preferential payment.

Harris, however, did not move for summary judgment, and Webster has not had an opportunity to challenge the $3,184.58 figure by, for example, showing that the pricing evidence in the record is contradicted by other evidence. In that procedural posture it would be inappropriate to grant Harris summary judgment on that $3,184.58.

### III

Harris is not entitled to recoup any amount for the estate's enjoyment of its rights under the Contract after the petition date.[20] As already discussed, Harris

---

**19.** In this regard, Webster has not disputed that Harris was, as a matter of nonbankruptcy law, entitled to insist on payment of the entire Contract price before it delivered services, and that Harris was free to terminate the Contract and cease providing maintenance services (as it eventually did based on non-payment of the remaining balance of $127,400).

**20.** The court assumes, without deciding, that Harris could assert recoupment as a defense. However, § 547(c)(4) is limited to new value imparted prior to the petition because the estate and the debtor are distinct entities. *See Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1284–85 (8th Cir.1988). When there are not enough assets to pay all administrative claims in full, administrative claims gen-

was no longer the owner of the equipment; Harris has not produced evidence of the value of the software usage; and Harris provided no maintenance services after September 20, 2000.

## IV

■ The parties agree that Florida law controls Harris's counterclaim. Harris has failed to show that the trustee's failure to return software or certify its destruction (because the software has been lost) has caused Harris harm for which the amount of damages is, as required by Florida law, "capable of proof to a reasonable certainty and not left to speculation or conjecture." *Aldon Industries, Inc. v. Don Myers & Assocs., Inc.*, 517 F.2d 188, 191 (5th Cir. 1975) (citations omitted). Although Harris has incurred attorney's fees and expenses in addressing Webster's lack of any right to sell the software, and corresponding with Webster regarding his efforts to locate the software, the Contract recognized that each party would bear its own expenses of litigation. Moreover, the attorney's fees and expenses were not a damage arising from the breach but only the cost of monitoring whether Webster had performed. Harris has not attempted to quantify damages arising from the breach itself.[21]

## V

■ Webster is entitled to recover prejudgment interest from the date of the filing of his complaint, September 27, 2002, at the rate provided by 28 U.S.C. § 1961. *See White v. Bradford (In re Tax Reduction Institute)*, 138 B.R. 325 (Bankr.D.D.C. 1991). That rate is 1.68% per annum, compounded annually. On a recovery of $124,215.42, that will result in interest of $4,628.36 through today's date, and with interest accruing at $5.9110 per day thereafter[22] and until entry of a final judgment. Postjudgment interest will then accrue on the entire judgment (including on the prejudgment interest component) as provided by 28 U.S.C. § 1961.

## VI

An order follows granting summary judgment in favor of Webster except as to $3,184.58 of the $127,400 payment, and directing Webster to advise whether he wishes to continue to pursue that $3,184.58 (other than via this motion for summary

erally share *pro rata*. In that circumstance, an issue arises whether a claim for services rendered postpetition can be paid in full (instead of *pro rata* with other administrative claims) via recoupment against a preference claim regarding a prepetition payment, that is, whether the transactions with the estate (here, Webster's alleged use of services under the Contract) can be considered part of the transaction with the debtor (here, NETtel's entry into the Contract), and whether § 547 otherwise bars the recoupment defense. *Compare Raleigh v. Mid Am. Nat'l Bank and Trust Co. (In re Stoecker)*, 131 B.R. 979, 983 (Bankr.N.D.Ill.1991) (recoupment is not a defense to a § 547 avoidance claim) *with Visiting Nurse Association of Tampa Bay, Inc. v. Sullivan (In re Visiting Nurse Association of Tampa Bay, Inc.)*, 121 B.R. 114, 121 n. 4 (Bankr.M.D.Fla.1990) (recoupment is a well recognized defense to a preference action).

21. The court is uncertain whether the record reflects that the software had not been lost prepetition: if that is the case, any breach would arguably be a prepetition claim that could not be asserted as a counterclaim for an administrative claim against the estate: it would only be a prepetition claim entitled to payment only after administrative claims.

22. The court has used a 365–day year in calculating the per diem rate for the period of September 27, 2004 through September 27, 2005. The period of September 27, 2003, through September 27, 2004, was treated as a one-year period 366 days in length because 2004 was a leap year.

judgment and his right to appeal denial of the motion).